George M. Lee (SBN 172982)
    gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, CA 94111
Phone: (415) 979-0500
Fax:  (415) 979-0511

Attorneys for Plaintiffs
CHAD LINTON, PAUL MCKINLEY STEWART,
KENDALL JONES, FIREARMS POLICY FOUNDATION,
FIREARMS POLICY COALITION,
SECOND AMENDMENT FOUNDATION,
THE CALGUNS FOUNDATION and MADISON
SOCIETY FOUNDATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAD LINTON, et al.,<br><br>              Plaintiffs,<br><br>    vs.<br><br>ROB BONTA, in his official capacity as<br>Attorney General of California, et al.,<br><br>              Defendants. | Case No. 3:18-cv-07653-JD<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[FRCP 56]**<br><br>Courtroom 11, 19th Floor<br>Judge:      Hon. James Donato |

**SEILER EPSTEIN LLP**

i

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-cv-07653-JD

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS AND PROCEDURAL HISTORY .....................................1

    A.  PLAINTIFF CHAD LINTON..........................................................................1

    B.  PLAINTIFF PAUL MCKINLEY STEWART .....................................................4

    C.  PLAINTIFF KENDALL JONES .....................................................................5

    D.  PROCEDURAL HISTORY............................................................................7

    E.  DEFENDANTS' POSITION ..........................................................................8

III.  ARGUMENT .....................................................................................................9

    A.  PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR CLAIM ALLEGING
        VIOLATION OF THE SECOND AMENDMENT...................................................9

        1.  Defendants Cannot Meet Their Burden to Show that Their Policies
            Are Consistent With the Nation's Historical Traditions.......................9

        2.  Plaintiffs Are Not Considered Felons Under the Laws of The State
            Where the Convictions Occurred.......................................................16

    B.  PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR CLAIM ALLEGING
        VIOLATION OF THE FULL FAITH AND CREDIT CLAUSE...................................19

    C.  PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR CLAIM ALLEGING
        VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE (ART. IV, § 2)
        AND THE PRIVILEGES OR IMMUNITIES CLAUSE (AMEND. XIV)...........................21

        1.  Defendants' Policies Violate Plaintiff Linton's Right to Travel to
            California Under Art. IV § 2 of the Constitution...........................22

        2.  Defendants' Policies Violate All Individual Plaintiffs' Right to Travel
            to California Under the Fourteenth Amendment. ...............................23

IV.  CONCLUSION ..................................................................................................25

SEILER EPSTEIN LLP

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Attorney General of N.Y. v. Soto-Lopez*, 476 U.S. 898, 106 S.Ct. 2317 (1986)...................24

*Baker v. Gen. Motors Corp.*, 522 U.S. 222, 118 S.Ct. 657 (1998)...........................20

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017).................................................5

*Beecham v. United States*, 511 U.S. 368, 114 S.Ct. 1669 (1994).........................19

*Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016),
    *cert. denied* 137 S.Ct. 2323 (2017) .................................................. *passim*

*Caron v. United States*, 524 U.S. 308, 118 S.Ct. 2007 (1998) ...........................19

*District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783 (2008) ...................9, 10, 11

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020).............................................7

*Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995 (1972)......................................24

*Estin v. Estin*, 334 U.S. 541 (1948) .................................................................20

*Folajtar v. Attorney General*, 980 F.3d 897 (3d Cir. 2020) ................................15

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)........................................14, 15, 16

*Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961) ...................................10

*Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 102 S.Ct. 1883 (1982) .............20

*Matsushita Elec. Industrial Co. v. Epstein*, 516 U.S. 367, 116 S.Ct. 873 (1996) ............20

*McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020 (2010) ...................10, 11

*Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076 (1974) ...........24

*Milliken v. Meyer*, 311 U.S. 457, 61 S.Ct. 339 (1940) ....................................21

*Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 56 S.Ct. 229 (1935)...........20

*National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco,
    Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012) ...........................13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. ___, 142 S.Ct. 2111 (Jun. 23, 2022)........................................ *passim*

*Pacific Employers Ins. Co. v. Industrial Accident Comm'n*, 306 U.S. 493, 59 S.Ct. 629 (1939)........20

SEILER EPSTEIN LLP

iii

**SEILER EPSTEIN LLP**

*People v. Gilbreth*, 156 Cal.App.4th 53 (2007)......................................................................21, 24

*People v. Williams*, 49 Cal.App.4th 1632 (1996) ..........................................................................21

*Roberts v. City of Fairbanks*, 947 F.3d 1191 (9th Cir. 2020)........................................................17

*Saenz v. Roe*, 526 U.S. 499, 119 S.Ct 1518 (1999) ........................................................22, 23, 24

*Sannmann v. Department of Justice*, 47 Cal.App.5th 676 (2020) .................................................21

*Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322 (1969) ........................................................24

*State v. Roundtree*, 395 Wis.2d 94, 952 N.W.2d 765 (Wis. 2021)...............................................15

*State v. Weber*, 163 Ohio St.3d 125, 168 N.E.3d 468 (Ohio 2020)..............................................15

*Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156 (1948) ..............................................................22

*United States v. Fitzgerald*, 935 F.3d 814 (9th Cir. 2019) ..........................................................21

*United States v. Fowler*, 198 F.3d 808 (11th Cir. 1999) ..............................................................19

*United States v. Phillips*, 827 F.3d 1171 (9th Cir. 2016)..............................................................12

*United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) ..............................................................11

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) ............................................................12

*V.L. v. E.L.*, -- U.S. --, 136 S.Ct. 1017 (2016) ............................................................................20

*Williams v. North Carolina*, 317 U.S. 287 (1942).......................................................................20

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021),
    cert. granted, judgment vacated, 2022 WL 2347578 (U.S. June 30, 2022) ...............................10


**Constitutional Provisions**

U.S. Const., Amend. II ...........................................................................................................1, 20, 24

U.S. Const., Amend. XIV .............................................................................................................22, 24

U.S. Const., art. IV, § 1 ................................................................................................................20, 21

U.S. Const., art. IV, § 2 ................................................................................................................22, 23

//

//

iv

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-cv-07653-JD

**SEILER EPSTEIN LLP**

**Statutes**

18 U.S.C. § 922(g) .............................................................................................. *passim*

28 U.S.C. § 1738 ...................................................................................................21

Cal. Pen. Code § 17(b) ..............................................................................21, 22, 23, 24

Cal. Pen. Code § 29800 ........................................................................................ *passim*

Cal. Pen. Code § 30105 ............................................................................................2

Cal. Pen. Code § 31635 ............................................................................................6

Cal. Pen. Code § 460 ..............................................................................................25

Cal. Pen. Code § 461 ..............................................................................................25

Cal. Pen. Code § 484g ............................................................................................25

Cal. Pen. Code § 489 ..............................................................................................25

Cal. Penal Code § 26710 ...........................................................................................6

Cal. Penal Code § 30305 ..................................................................................1, 7, 25

Cal. Veh. Code § 2800.2 ..........................................................................................24

Rev. Code of Wash. 9.41.040 .......................................................................................2

**Other Authorities**

1 *Journals of the Continental Congress*, 1174-1789, 285 (1906) ..................................13

1 *Private and Special Statutes of the Commonwealth of Massachusetts from 1780-1805* (1805) ......13

1 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*
    (Jonathan Elliot ed., 2d ed. 1836) ......................................................................13

Black's Law Dictionary (10th ed. 2014) ........................................................................17

Joseph Greenlee, *The Historical Justification for Prohibiting Dangerous
    Persons From Possessing Arms*, 20 WYO. L. REV. 249 (2020) ..............................12, 13

**Rules**

Fed. R. Civ. Pro. 30(b)(6) ..........................................................................................8

v

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-cv-07653-JD

**SEILER EPSTEIN LLP**

## I.    INTRODUCTION

This action seeks to vindicate and restore the fundamental right to keep and bear arms, a right which the State is denying individual plaintiffs Linton, Stewart and Jones. The State, acting through the defendants' policies interpreting Cal. Pen. Code §§ 29800 (prohibiting possession of firearms by a felon) and/or 30305 (ammunition), deprives plaintiffs and others similarly situated of their rights, on the grounds that once one is a convicted felon, he is always a convicted felon. However, those purportedly disqualifying felony convictions emanating from other states have been set aside, vacated or were otherwise dismissed, and plaintiffs' rights have been expressly restored to them there. Accordingly, there is no legal or equitable bar to the continuing deprivation of the plaintiffs' rights under the Second Amendment here. Individual plaintiffs Linton, Stewart and Jones are entitled to declaratory and injunctive relief from the enforcement of sections 29800 and/or 30305 against them. Summary judgment, or in the alternative, partial summary judgment as to each claim, should be entered in favor of all plaintiffs herein. For purposes of this motion, the organizational plaintiffs Firearms Policy Foundation, Firearms Policy Coalition, Inc., Second Amendment Foundation, Inc., California Gun Rights Foundation, and Madison Society Foundation, are moving on behalf of plaintiffs Linton, Stewart and Jones, each of whom are members. The relief that all plaintiffs seek in this motion is for judgment that would provide relief to individual plaintiffs Linton, Stewart and Jones.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    PLAINTIFF CHAD LINTON

In 1987, while plaintiff Chad Linton was serving in the U.S. Navy, and stationed at NAS Whidbey Island, Washington, he tried – albeit briefly – to outrun a Washington State Police officer and make it back to base. He reconsidered the idea, and was arrested without resistance.  (Linton Decl., ¶ 7). Mr. Linton was charged and pled guilty to attempted evasion, a Class C felony under the Revised Code of Washington, and driving while intoxicated, a misdemeanor.  (Id., ¶ 8). He spent seven days in jail. (Id.) In 1988, he successfully completed his probation, and received a certificate of discharge, and reasonably believed, based upon statements made by the Washington State court judge that the matter had been dismissed from his records. (Id., ¶ 9).

After leaving the service, Mr. Linton moved back to California, where he raised a family and remained a law-abiding citizen. In 2015, he attempted to make a firearm purchase but was surprised to learn that California DOJ denied the purchase, due to the Washington State conviction. (Linton Decl., ¶ 13). Mr. Linton hired a Washington attorney who re-opened the criminal proceedings, withdrew the guilty plea, and entered a retroactive not-guilty plea. (Id.) The court then issued its "Order on Motion Re: Vacating Record of Felony Conviction," in which it specifically found that the crime for which Mr. Linton was convicted was not a violent offense. (Id., ¶ 14; Linton Exh. A, p. 2). The court granted the motion to vacate the conviction, set aside the guilty plea, and released plaintiff from all penalties and disabilities resulting from the offense. On April 18, 2016, the Island County Superior Court also issued a separate Order Restoring Right to Possess Firearms pursuant to Revised Code of Washington 9.41.040(4). (Linton Decl., ¶ 15; Linton Exh. B).

Mr. Linton underwent a Personal Firearms Eligibility Check ("PFEC"), pursuant to Cal. Pen. Code § 30105(a), to confirm his eligibility to purchase and/or possess a firearm, which indicated he was eligible. (Linton Decl., ¶ 16; Linton Exh. C). In 2018, Mr. Linton attempted to purchase a rifle, but was again denied. (Linton Decl., ¶ 17; Linton Exh. D). He then underwent a "Live Scan" fingerprint-based background check request with the DOJ directly, which again showed the presence of no felony convictions.  (Linton Decl., ¶ 18).

Mr. Linton's attorney began discussions with the California DOJ to correct his status as a "prohibited person" here. His counsel provided the DOJ with the Washington court orders vacating the felony conviction and restoring his firearm rights. (Linton Decl., ¶ 19; Richards Decl., ¶ 4). In response, the DOJ informed Mr. Linton that "the [felony] entry in question cannot be found on your California criminal history record, therefore, no further investigation is required[,]" and that his fingerprints "did not identify any criminal history maintained by the Bureau of Criminal Information and Analysis." (Linton Decl., ¶ 20; Linton Exs. F and G). Based upon these letters, Mr. Linton attempted to purchase a revolver in March 2018, but was again denied. (Linton Decl., ¶ 21). Then, on April 3, 2018, agents from the DOJ's Armed Prohibited Persons System (APPS) enforcement program came to Mr. Linton's home, and seized several firearms that he had acquired and owned throughout the years, including an antique, family-heirloom shotgun that was once owned by his

**SEILER EPSTEIN LLP**

2

grandfather. (Id., ¶ 22). All of these firearms were acquired through legal purchases or transfers, through federally-licensed firearm dealers (FFLs), and pursuant to DOJ background checks. Mr. Linton's wife showed the DOJ agents the Washington State court orders that vacated the felony conviction, and restored Mr. Linton's gun rights. These agents sought guidance from defendant Wilson, who purportedly advised that the Washington court orders would have no effect here, and ordered seizure of the firearms. (Id.)

Mr. Linton's attorney, Adam Richards, spoke with Mr. Wilson, who informed him that he had personally reviewed the records in question, and stated "the Department's position" was that they would not honor the out-of-state orders which vacated or dismissed Mr. Linton's case. (Richards Decl., ¶ 5). Mr. Wilson stated that this was routinely how the Department handled such out-of-state felony convictions that had been set aside or vacated. (Id.)

In 2020, Mr. Linton moved with his family to Nevada. (Linton Decl., ¶ 3.) A substantial factor that motivated their move was that California still considers him to be a "felon," prohibited from owning or purchasing firearms. (Id.) That he cannot exercise an important and fundamental constitutional right was an important reason why they moved. (Id.) Nevertheless, he continues to maintain a residential interest in California, including a recurring annual lease on property located in Placer County. (Id., ¶ 4.) He built a cabin on that property, but as it is so remote, and abundant with wildlife, feels unprotected in that area without at least the option of having appropriate firearms available or at hand if needed. (Id.) Otherwise, he continues to have family here, and would like to be able to possess or handle firearms or ammunition for recreational purposes, such as target shooting, while he is visiting. (Id., ¶ 5). He intends to return eventually, but feels he cannot do so until this matter is resolved. (Id., ¶ 6).

In this case, Department of Justice representative Gilbert Matsumoto testified, among other subjects discussed below, as to the basis for Mr. Linton's denial of his attempts to purchase a firearm, and his prohibited status. (Matsumoto Depo. (Lee Decl. Exh. A) at 71:8-17). The sole basis for his denial was the 1987 felony conviction from Washington State. (Matsumoto Depo. at 74:21 - 75:13). However, the FBI records which the Department accessed when it made the determination to deny Mr. Linton a firearm shows "zero felonies." (Matsumoto Depo. at 79:16 - 80:5; Lee Decl. Exh.

**SEILER EPSTEIN LLP**

E at p. 015). The disposition of the prior felony conviction shows up as "vacated," which meant that there were "zero felonies" as far as the State of Washington was concerned. (Matsumoto Depo. at 80:8-25; Lee Decl. Exh. E, p.015). However, a handwritten notation by the DOJ analyst duly followed California's policy (discussed below) in noting "Not recognized [in] CA!" (Matsumoto Depo. at 81:2-15; Lee Decl. Exh. E, p. 015).

B.  **PLAINTIFF PAUL MCKINLEY STEWART**

In 1976, when plaintiff Stewart was 18 years old, and living in Arizona, he succumbed to a crime of opportunity, and stole some lineman's tools from a telephone company truck.  (Stewart Decl., ¶ 4). When the police came to his residence to investigate, Mr. Stewart gave up the tools and offered no resistance to his arrest. (Id.) Mr. Stewart was found guilty of first degree burglary, a felony, in the County of Yuma, Arizona. He was sentenced to three years of probation, and the Court imposed a suspended sentence. (Id., ¶ 5). He successfully completed his probation in 1978, and believed that the felony conviction had been dismissed. (Id., ¶¶ 5-6).

Since moving to California in 1988, Mr. Stewart has been a law-abiding citizen, and remained steadily and gainfully employed. (Stewart Decl., ¶ 7). In 2015, he attempted to purchase a pistol for self defense in the home, which was denied due to the presence of a felony conviction. (Id., ¶ 8). A Live Scan fingerprint background check showed a lingering conviction, but did not reflect whether it was a felony. It also stated that it was "undetermined" whether he was eligible to purchase firearms. (Id., ¶ 9).

Mr. Stewart filed an application to restore his firearm rights and to set aside his judgment of guilt with the Superior Court of Yuma County, Arizona, which issued an order restoring his firearm rights, and specifically set aside the judgment of guilt. (Stewart Decl., ¶ 11; Stewart Exh. A). Believing the matter would be automatically updated in any background search, Mr. Stewart attempted to make another firearm purchase on February 10, 2018, which the DOJ also denied. (Stewart Decl., ¶¶ 13-14). Mr. Stewart had several telephone conversations with DOJ officials, who informed him that the Arizona felony conviction disqualified him from possessing or purchasing firearms, notwithstanding the Arizona court's order. (Id., ¶ 15).

Department of Justice representative Matsumoto testified as to the basis for Mr. Stewart's

4

SEILER EPSTEIN LLP

firearm denial. (Matsumoto Depo. at 89:25 - 90:6; Lee Decl. Exh. D, ¶¶ 7-8). Mr. Stewart's DROS[1] denial, which occurred in 2018, was based solely upon his 1976 burglary conviction from Arizona. (Matsumoto Depo. 91:6-24). Mr. Stewart's criminal history record indicates the 1976 burglary conviction, but a set-aside order was granted on August 11, 2016.  (Matsumoto Depo. 92:11-19; Lee Decl. Exh. F). But again, a DOJ analyst had noted that the set-aside order[2] was not recognized in California. (Matsumoto Depo. at 93:6-11; Lee Decl. Exh. F). Mr. Stewart's restoration of rights had no effect in California because, in the Department's view, only a governor's pardon would be recognized. (Matsumoto Depo. at 94:25 - 95:11).

## C.   PLAINTIFF KENDALL JONES

Plaintiff Kendall Jones has lived in the County of Sacramento, for over 39 years. (Jones Decl., ¶ 1). He was employed by the California Department of Corrections as a Correctional Officer for 30 years until his final retirement in 2014, and served as a firearms and use-of-force instructor for the DOC. Mr. Jones also worked as the Primary Armory Officer for the California State Prison Solano facility for over 19 years. (Id, ¶ 3). He is POST-certified and NRA-certified in the subjects of firearms, laws, self-defense, firearms safety and responsibility, and in his career received numerous letters of commendation and appreciation, both pertaining to his primary duties as a Correctional Officer, and also as a firearms and use-of-force instructor. (Id., ¶ 3-4). Since retirement, he has pursued the natural course of his career as a law enforcement firearms trainer, and in this capacity, he has personally trained thousands of peace officers and private citizens in the proper use of handguns, rifles, shotguns, less-lethal defensive weapons (e.g., pepper spray) and use of force. (Id., ¶ 5).

When he was 19 years old – over three decades ago – Mr. Jones was arrested in Houston, Texas, from an incident involving the alleged misuse of a credit card. Mr. Jones maintains that he had used a credit card under mistaken pretenses. (Jones Decl., ¶ 8). Nevertheless, after being charged

---

[1] DROS stands for "Dealer Record of Sale," the system through which all firearm sales and transfers are regulated. *Bauer v. Becerra*, 858 F.3d 1216, 1218-1219 (9th Cir. 2017). The DROS system is administered by the Department of Justice, and these functions are not delegable to a local law enforcement agency. (Matsumoto Depo. at 30:16 - 31:2).

[2] The Arizona Terminology Page uses the term "13-907," a code which means the set-aside of a conviction. (Lee Decl. Exh. J at p. 216; Matsumoto Depo. at 94:7-24).

SEILER EPSTEIN LLP

with credit card fraud in 1980, the prosecutor made an offer to have the court set aside and dismiss the matter, following a period of probation, if Mr. Jones agreed to plead guilty to a single charge of "credit card abuse," a third degree felony under Texas law, which involved no term of confinement. (Id., ¶ 9). In light of the prosecutor's offer by which the charges would be set aside and dismissed, Mr. Jones accepted the deal, pled guilty to the charge offered, and completed a three-year term of probation. (Id). After successfully completing probation, on or about August 22, 1983, per the agreement, the district court for the County of Harris, Texas, permitted him to withdraw his plea of guilty, and set aside and dismissed the judgment of conviction. (Id., ¶ 10; Jones Exh. A).

Mr. Jones then moved to California and pursued a career in law enforcement with the State of California. (Jones Decl., ¶ 11). For thirty years, he legally and necessarily owned and possessed firearms, as a part of his profession, for personal protection, recreation and other lawful purposes. (Id., ¶ 12). Since retiring in 2014, Mr. Jones has had a career as a law enforcement firearms and use-of-force trainer, drawing upon 30 years of training and experience in the field.  To continue in this field and chosen profession, of course, he is required to own, possess, handle and use firearms and ammunition. (Id.)

He previously held a Certificate of Eligibility ("COE") to possess firearms and ammunition under Cal. Penal Code § 26710, a necessary requirement to becoming or maintaining status as a certified firearm instructor under current DOJ policy. (Jones Decl., ¶ 13).  In fact, even as of 2019, at the time plaintiffs filed suit, Mr. Jones was listed on the Department of Justice's website as one of its Certified Instructors eligible to provide training specified by Pen. Code § 31635(b). (Jones Decl., ¶ 12; Jones Exh. B). But in 2018, after he submitted his renewal application for his COE, which he had held since 2010, the DOJ informed him that his application was being delayed. (Jones Decl., ¶ 14.) After Mr. Jones initiated a record review request, the Department informed him on February 23, 2019 that he was "not eligible to own, possess or have under [his] custody or control any firearm[,]" and denied him the renewed COE. (Id.; Jones Exh. C).

Mr. Matsumoto testified that the sole basis for the denial of Mr. Jones's COE was the felony conviction from Texas. (Matsumoto Depo. at 100:14 – 101:1). The criminal history records, however, showed that the disposition of that court case was that the matter was "dismissed" and that

6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-cv-07653-JD

SEILER EPSTEIN LLP

under a heading called "provision," the matter was "set aside." (Id., at 101:18 – 102:14; Lee Decl. Exh G at p. 2). Mr. Matsumoto indicated, however, that California would not honor a set aside order from Texas. (Matsumoto Depo. at 102:21 – 103:1).

**D.   PROCEDURAL HISTORY**

Plaintiffs filed this action to challenge the firearms prohibition imposed by Pen. Code §§ 29800 and 30305, as applied to Messrs. Linton and Stewart, on December 20, 2018.  Organizational plaintiffs Firearms Policy Foundation, Firearms Policy Coalition, Inc., Second Amendment Foundation, Inc., California Gun Rights Foundation, and Madison Society Foundation joined individual plaintiffs Linton and Stewart, to vindicate their members' rights, and on also behalf of all similarly-situated members of those organizations.

Defendants filed a motion to dismiss (ECF No. 12) on February 22, 2019. After a hearing, on August 23, 2019 this Court terminated the motion to dismiss on the grounds that the motion "raises issues best addressed in summary judgment proceedings," and directed plaintiffs to file this motion by June 22, 2020. (ECF No. 26).

On November 15, 2019, plaintiffs filed their motion for leave to file an amended complaint, to add plaintiff Kendall Jones to these proceedings, asserting a similar claim. (ECF No. 30). Plaintiffs filed their First Amended Complaint (ECF No. 36) on December 2, 2019.

On June 22, 2020, plaintiffs filed their first iteration of their motion for summary judgment, or in the alternative, for partial summary judgment. (ECF No. 47). Defendants opposed the motion. (ECF No. 48). Plaintiffs filed their reply on September 21, 2020 (ECF No. 49), and the matter was submitted.

Following submission of the first summary judgment motion, on March 5, 2021, this court ordered an administrative stay on the case, pending the Ninth Circuit's final, *en banc* determination of *Duncan v. Becerra*, No. 19-55376, a case that had been cited by both sides in their summary judgment briefing as to the meaning of intermediate scrutiny in Second Amendment cases. *See*, *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020). This court's order required the parties to file a joint status report within thirty days of the *en banc* decision that would address whether new or additional briefing is warranted. (ECF No. 53).

**SEILER EPSTEIN LLP**

On June 23, 2022, the United States Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ___, 142 S.Ct. 2111 (Jun. 23, 2022). *Bruen* specifically held that means-end scrutiny analyses are no longer permissible in Second Amendment cases. Accordingly, on June 28, 2022, plaintiffs filed an administrative motion to lift the stay, on the grounds that the cited portions of *Duncan* were no longer relevant or applicable, and requested the opportunity to provide supplemental briefing on plaintiffs' Second Amendment claims following *Bruen*. (ECF No. 57).

On June 30, 2022, this court ordered that the stay be lifted, and directed the parties to file new summary judgment motion papers in lieu of supplemental briefs. (ECF No. 58).

**E.   DEFENDANTS' POSITION**

The defense in this matter has been to deny that there is any official policy regarding the treatment of out-of-state convictions that have been set aside, vacated, or dismissed. Instead, defendants have insisted that they are simply applying the language of Penal Code § 29800(a) in concluding that "[a]ny person who has been convicted of […] a felony under the laws […] of any other state" is prohibited from owning a firearm.

Gilbert Matsumoto was produced as the Department of Justice's Rule 30(b)(6) deposition witness on certain categories, including the Department's policy regarding the treatment of former felons whose convictions have been set aside or vacated in their respective states of origin. (Matsumoto Depo. at 16:1-9; 23:20-24:4; Lee Decl. Exh. D). Mr. Matsumoto denied that there is any written or unwritten policy on this topic (Matsumoto Depo. 24:5-24). Instead, as Mr. Matsumoto succinctly states the State's position, it is simply a matter of following the state's codes. (Id., at 24:5-11). Defendants' position is that theirs is simply a straightforward reading of Pen. Code § 29800, i.e., if a person is convicted in another state of a felony, California would prohibit that person from acquiring a firearm irrespective of whether the felony conviction was set aside or vacated. (Matsumoto Depo. at 55:17 - 56:5).

However, defendants have also produced in this litigation a DOJ document entitled "Background Clearance Unit DROS Procedures," marked in this litigation as Exhibit 005. (See Exh. 005 (Lee Decl., Exh. C); Matsumoto Depo. at 25:9-15). This is a document that DOJ analysts follow

8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-cv-07653-JD

SEILER EPSTEIN LLP

to determine and individual's eligibility to own or possess firearms in California. (Matsumoto Depo. at 26:9-19). This document is part of a larger "training binder," which was reviewed by staff, supervisors, and the DOJ's attorneys for use by the Department's Background Clearance Unit. (Id., at 27:2-16). Defendants deny that this document is either reflective of a policy statement, or a memorandum (See Defendants' Response to Request for Admission No. 10 (Lee Decl. Exh. B) at 5:10-13 ("Defendants deny that Exhibit 005 is a memorandum and deny that Exhibit 005 constitutes a 'policy.' Penal Code § 29800 serves as the guiding principle on treatment of out-of-state felony convictions and possession of firearms in California.")

This document provides, in a section entitled "Other States," that "the laws of that state where the conviction occurred apply." (Lee Decl. Exh. C at p. 080). But that is not the actual policy or practice that the Department follows in honoring or respecting another state court's final judgment. Instead, the Department's analysis is simple: if one was convicted in another state of any felony, period, they will be prohibited from having a firearm here unless they have a governor's pardon from that state. (Matsumoto Depo. at 33:8 - 34:1).

Under the heading of "Pardons / Civil Liability Relief – Other States," Exhibit 005 otherwise and succinctly states the policy here as follows: "A person convicted of a felony in another state whose civil disabilities were removed under the laws of that state (similar to PC section 12023.4) is prohibited from possessing handguns in California (AG Opinion No. 67-100. DAG Winkler, 7/26/1967)." (Lee Decl. Exh. C, at p. 082).

The origin of the State's policy, therefore, is a late 20th century Attorney General Opinion, and not a decision emanating from a contested, adversarial proceeding.

## III.   ARGUMENT

**A.   PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR CLAIM ALLEGING VIOLATION OF THE SECOND AMENDMENT.**

### 1.   Defendants Cannot Meet Their Burden to Show that Their Policies Are Consistent With the Nation's Historical Traditions.

In *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783 (2008), the Supreme Court affirmed an individual right to possess a firearm unconnected with militia service. 554 U.S. at 582.

9

SEILER EPSTEIN LLP

In *McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020 (2010), the Court held that Second Amendment right as recognized in *Heller* was a right fundamental to our system of ordered liberty. 561 U.S. at 778, 791.

And in *Bruen*, the Supreme Court rejected interest-balancing tests such as the former "two-step" approach that the circuit courts had used in Second Amendment cases. In the Ninth Circuit, for example, that former test had required a court first to ask "if the challenged law affects conduct that is protected by the Second Amendment," basing that determination on a "historical understanding of the scope of the right." If the challenged restriction burdened conduct protected by the Second Amendment, the court then moved to the second step of the analysis to determine "the appropriate level of scrutiny." *Young v. Hawaii*, 992 F.3d 765, 783–84 (9th Cir. 2021), *cert. granted, judgment vacated*, 2022 WL 2347578 (U.S. June 30, 2022).

*Bruen* concerned review of the State of New York's licensing and permitting scheme, whereby a showing of "proper cause" had been required to carry a concealed handgun outside of the home. The statute was upheld by the Second Circuit, purely on the grounds that the proper cause requirement "was 'substantially related to the achievement of an important governmental interest.'" *Bruen*, 142 S.Ct. at 2125 (citations omitted). The Supreme Court reversed, and stated that those balancing tests as previously applied by the circuit courts could no longer apply, expressly holding:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S.Ct. at 2126 (citing *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

Therefore, following *Bruen*, the salient questions in this case are twofold: First, whether the plain text of the Second Amendment covers the conduct at issue. The text of the Second Amendment

10

SEILER EPSTEIN LLP

plainly states that the right "to keep and bear Arms" is reserved to "the people." *United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019) (assuming without deciding that unlawful aliens fall within the scope of the Second Amendment right). "There seems to us no doubt, on the basis of both text and history, that the Second Amendment confer[s] an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. And it is undisputed that all of the plaintiffs, as citizens, do have and enjoy the right to keep and bear arms in the states from which the convictions originally emanated. But in California, they lack the right to own firearms at all, whether in the home, or for any purposes of self-protection generally. Therefore, since the plain text of the Second Amendment covers the rights they seek to exercise *here*, the Constitution presumptively protects that conduct.

The second, and more involved question is whether the State can now meet its burden to show that its regulations at issue are consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 142 S.Ct at 2126. "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.*, at 2131. In *Bruen*, the *Court* noted that *Heller* looked to founding-era historical precedent, including "various restrictive laws in the colonial period," and finding that none was analogous to the District of Columbia's total ban on handguns, concluded that the ban was unconstitutional. *Id.* (citing *Heller*, 554 U.S. at 631). The Court later stated that "not all history is created equal," 142 S.Ct. at 2136, and that "Constitutional Rights are enshrined with the scope they were understood to have when the people adopted them." *Id.*, (citing *Heller*, 554 U.S. at 634-635). Accordingly, we are to focus primarily on the history of the founding era. *Id.*

To be sure, in *Heller*, the Court explained that its recognition of an individual right to bear firearms would not "cast doubt on longstanding prohibitions on the possession of firearms by felons[,]" among other restrictions. *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786. However, the total prohibition defendants are enforcing against plaintiffs here is not "longstanding" in relative terms, and in any case, plaintiffs are not of a class of persons the Founders understood to be prohibited from possessing arms—i.e., violent and otherwise dangerous persons. *Binderup v. Attorney General*, 836 F.3d 336, 348 (3d Cir. 2016), *cert. denied* 137 S.Ct. 2323 (2017).

**SEILER EPSTEIN LLP**

The historical inquiry is: Can the State show that there is a relevant historical tradition, dating to the founding era, which allows for lifetime disarmament of individuals convicted of non-violent felonies? An examination of the scholarship and legal analysis of this period leads to the conclusion that as a matter of our Nation's history, prohibited persons could have their rights restored once they were no longer considered *dangerous*. As noted in *United States v. Phillips*, 827 F.3d 1171 (9th Cir. 2016), "there are good reasons to be skeptical of the constitutional correctness of categorical, lifetime bans on firearm possession by *all* felons." 827 F.3d at 1174 (emphasis original). In *Phillips*, although the Ninth Circuit affirmed the defendant's conviction under 18 U.S.C. § 922(g)(1), it noted the scholarly disagreement over whether the practice of lifetime bans on firearm ownership by felons was historically justified, and under what theory. Nevertheless, the Court in *Phillips* indicated that it was bound by *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010), which had upheld a criminal defendant's challenge to the constitutionality of 18 U.S.C. § 922(g)(1), and likewise, upheld the defendant's conviction.

But with the abrogation of the former two-step approach by *Bruen*, it is time for this scholarly disagreement to be resolved. FPC Action Foundation's scholar Joseph Greenlee has examined the issue, and concluded that from the earliest colonial days through the nineteenth century, "there is no historical basis for denying nonviolent felons the right to keep and bear arms." *See*, Joseph Greenlee, *The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 257 (2020).[3]

Greenlee's article specifically examined the nation's history of categorical firearm prohibitions, looking to England's historical traditions, and founding-era prohibitions, both of which found well-practiced traditions of disarming *dangerous* persons – particularly where such persons were perceived as likely to engage in rebellion or insurrection. Greenlee, at 261-263. During the American Revolutionary War, for example, the Continental Congress recommended that colonies disarm persons "who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies." Greenlee, at

---

[3] Currently available online at: https://scholarship.law.uwyo.edu/wlr/vol20/iss2/7/.

12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-cv-07653-JD

SEILER EPSTEIN LLP

264 (citing 1 *Journals of the Continental Congress*, 1174-1789, 285 (1906)). Most disarmament efforts during the colonial period targeted such "disaffected persons," following English traditions, out of concern for violent insurrections and to disarm those who might be in rebellion against them. Greenlee, at 265; *National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012). Following the Revolution, the new states continued their tradition of recognizing the right to own firearms by "peaceable persons," which was equivalent to being nonviolent. Greenlee, at 266. But again, founding-era lawmakers were particularly troubled by persons who would take up arms in rebellion. *Id*. (citing 1 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (Jonathan Elliot ed., 2d ed. 1836)). And those states which did allow for firearm prohibitions were concerned with dangerous persons. Greenlee, at 267-268.

But even notwithstanding the founding-era preoccupation with insurrection and rebellion, it was also clear that those who were disarmed for being a danger to republican causes could have their rights restored to them. Most famously is Daniel Shays, who led an armed, now-eponymous uprising in Massachusetts starting in 1786, in which the rebellion attacked state courthouses and the federal arsenal at Springfield, Massachusetts. Ultimately Shays's Rebellion was put down by a militia, and participants of the uprising were disqualified on the grounds of treason, from the right to bear arms. Greenlee, at 268-269. However, such disqualification was temporary, as it lasted for three years. *Id*. (citing 1 *Private and Special Statutes of the Commonwealth of Massachusetts from 1780-1805*, 146-148 (1805)).

Beyond the scholarly examination, the federal judiciary has also undertaken the relevant historical analysis, and noted jurists have concluded that founding-era laws and traditions as to who could be prohibited from bearing arms extended to categories of persons who were deemed to be *dangerous*, but not a categorical blanket that would have included non-violent persons.

In *Binderup v Attorney General*, the Third Circuit, sitting *en banc*, held that 18 U.S.C. § 922(g)(1) could not bar the plaintiffs from firearm possession as a result of their earlier disqualifying state law misdemeanor convictions. 836 F.3d at 356-57. The *en banc* court held that section 922(g)(1) violated the Second Amendment as applied to those individual plaintiffs based on different

13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-CV-07653-JD

SEILER EPSTEIN LLP

triggering state law offenses. 836 F.3d at 340-41. The plaintiffs' rights to possess firearms were expressly restored to them by a state court, but they continued to be barred under federal law, section 922(g)(1). *Id.* at 340. Although the court applied the now-abrogated two-step test, Judge Ambro's opinion also examined the traditional justification for denying felons the right to arms, and concluded that the plaintiffs were not categorically barred from raising as-applied challenges because they were able to demonstrate that "their offenses were not serious enough to strip them of their Second Amendment rights." *Id.*, at 351.

Judge Hardiman's concurring opinion in *Binderup* further did a deeper examination into the historical justification for felon dispossession, including the history of the founding era. Judge Hardiman concluded that "[t]he most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms." 836 F.3d at 367 (Hardiman, J., concurring). His examination included founding-era proposals and debates, but noted that although those debates "point strongly toward a limit on Second Amendment rights centered on dangerousness, dispossessory regulations enacted to that end were few and far between in the first century of our Republic." *Id.*, at 368. Judge Hardiman continued: "[A] common thread running through the words and actions of the Founders gives us a distinct principle to inform our understanding of the original public meaning of the text of the Second Amendment. See, e.g., Marshall, 32 Harv. J.L. & Pub. Pol'y at 698 ("[A]ctual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that ... its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger.")" *Binderup*, 836 F.3d at 369 (Hardiman, J., concurring).

And in *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019), the Seventh Circuit considered and rejected a non-violent convicted felon's as-applied challenge to 18 U.S.C. § 922(g)(1). The Seventh Circuit utilized its version of the now-invalidated two-step test and rejected the plaintiff's claim. Though the majority opinion in *Kanter* found that the "historical evidence was inconclusive" as to whether felons were categorically excluded from the Second Amendment's scope (likewise noting

SEILER EPSTEIN LLP

"scholarly disagreement" about the extent to which felons were considered excluded from the right to bear arms), it expressly declined to decide that issue. 919 F.3d at 447. Instead, the majority opinion in *Kanter* upheld the constitutionality of § 922(g)(1) on intermediate scrutiny. *Id.*, at 448-450.

In her dissent, however, then-Judge Barrett did the thorough work that the majority opinion had declined to do, and concluded that founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons, but rather, their dispossession arose only when they judged that such disqualifications were necessary to protect public safety. 919 F.3d at 451 (Barrett, J., dissenting). First, Judge Barrett examined the relevant, founding-era laws that explicitly imposed or authorized the legislatures to impose such categorical bans on felon firearm possession, and concluded that "at least thus far, scholars have not been able to identify any such laws." *Id.*, at 454. Judge Barrett's survey of founding-era legislative proposals and debates over the scope of the right to keep and bear arms found:

> Whatever else may be said about the particulars of each of these three proposals, they are most helpful taken together as evidence of the scope of founding-era understandings regarding categorical exclusions from the enjoyment of the right to keep and bear arms. The concern common to all three is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury. […] This is the same concern that animated English and early American restrictions on arms possession.

*Id.*, at 456 (Barrett, J., dissenting) (citing *Binderup*, 836 F.3d at 368 (Hardiman, J., concurring in part)). Judge Barrett's exhaustive historical survey of the relevant era concluded: "In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety. But neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons." 919 F.3d at 458 (Barrett, J., dissenting). Other jurists have likewise diligently done the work as to the relevant history, and have reached the same or similar conclusions. *See*, *Folajtar v. Attorney General*, 980 F.3d 897, 913-920 (3d Cir. 2020) (Bibas, J., dissenting); *State v. Roundtree*, 395 Wis.2d 94, 156-161, 952 N.W.2d 765 (Wis. 2021) (Hagedorn, J., dissenting); *State v. Weber*, 163 Ohio St.3d 125, 151-54, 168 N.E.3d 468 (Ohio 2020) (DeWine, J., concurring in the judgment).

*Bruen* now requires this analysis, but the work has already been done. As shown in the

SEILER EPSTEIN LLP

scholarship, in Judge Hardiman's concurring opinion in *Binderup*, in then-Judge Barrett's dissent in *Kanter*, and the other cases cited, defendants' enforced prohibition here has no founding-era historical predicate because founding-era prohibitions were concerned with preventing *dangerous* persons from taking up arms, against the government or otherwise. The State cannot meet its burden to show a historical predicate to permanently prohibiting *all non-violent* felons from owning firearms.

### 2.   Plaintiffs Are Not Considered Felons Under the Laws of The State Where the Convictions Occurred.

Following *Bruen*, defendants' primary defense, that they are simply applying a literal reading of Pen. Code § 29800(a), is no longer relevant to the matter.

But even if we take the Department's position at face value, that the Department considers "[t]he laws of that particular state where the conviction occurred apply" (Lee Decl. Exh. C, at p. 080), that cannot be a one-way street as DOJ representative Matsumoto suggests. (See, Matsumoto Depo. at 33:8 – 34:1; 69:20 – 70:1). Mr. Matsumoto explained that in following this rule that "the laws of the particular state where the conviction occurred apply," a DOJ analyst is required to look at the laws of that particular state (as a part of their "due diligence"), in examining the meaning of certain words and phrases, such as whether the conviction was "set aside." (Matsumoto Depo. at 36:16 - 37:10). But this is simply lip-service, for we learned that even if the other states' definitions consider a vacated or set-aside conviction to have nullified it in the first instance, the State simply reverts to its fallback position which is that section 29800 simply prohibits *all* persons conviction of felonies, irrespective of whether it was deemed nullified. (Matsumoto Depo. at 70:12-23).

In Plaintiff Linton's case, the final order on his case was on a "motion to vacate" the felony conviction, which was granted. (Linton Exh. A, pp. 1-2). And his criminal records, upon which the DOJ relied, specifically indicated that the final disposition of the conviction was that it had been "vacated." (Matsumoto Depo. 80:8-15). Mr. Matsumoto said that DOJ procedure would be to consult the Washington Terminology page of the "FBI binder," a binder the FBI prepared and updates in administering the National Instant Criminal Background Checks System ("NICS") program, and to look up the definition of "vacate" as used in Washington (Matsumoto Depo. at 83:5-25; 84:17-24; Lee Decl. Exh. L at p. 255), to determine that the term "vacate" means the felony

16

conviction still exists for firearm purposes. (Matsumoto Depo. at 85:5-12). This was the described process, notwithstanding that as far as the State of Washington was concerned, there were "zero felonies" on Mr. Linton's record. (Id. at 80:3-25). And moreover, this conclusion files in the face of the common understanding of what a "vacated" conviction is, as the Ninth Circuit affirmed. *See*, *Roberts v. City of Fairbanks*, 947 F.3d 1191, 1198 (9th Cir. 2020) ("Because all convictions here were vacated and underlying indictments ordered dismissed, there remains no outstanding criminal judgment nor any charges pending against Plaintiffs. […] According to Black's Law Dictionary, the definition of 'vacate' is 'to nullify or cancel; make void; invalidate[.]'" (citing Black's Law Dictionary 1782 (10th ed. 2014)). But really, this doesn't matter, for as shown below with respect to the treatment of Messrs. Stewart and Jones's convictions, the "terminology" used by another state's criminal justice system is only followed when it actually *confirms* the existence of a felony conviction, but not the other way around.

For example, in Plaintiff Stewart's case, the Arizona court granted his application to set aside the judgment of guilt, and included a "dismissal of the Information/Indictment" in restoring his rights to him. (Stewart Decl., ¶ 11; Stewart Exh. A). His criminal history record also shows, however, that the 1976 burglary conviction had been set aside on August 11, 2016. (Matsumoto Depo. at 92:11-19; Lee Decl. Exh. F). Mr. Matsumoto again described the process in which he consulted "the FBI Binder" to look at the specific terminology that state uses in determining the disposition of the offense. (Matsumoto Depo. at 94:2-14). And his conclusion, ratifying the decision of the DOJ analyst, was that a set aside order was not recognized in California. (Id. at 93:6-11). Mr. Stewart's restoration of rights had no effect in California because, in the Department's view, only a governor's pardon would be a recognized restoration of his firearm rights. (Id., at 94:25 - 95:11). But the "Arizona Terminology Page" provides that if the 13-907 (set aside) order occurred after July 3, 2015, and was not for a "serious offense," (which does not include third degree burglary) then it "[r]emoves both federal and AZ state prohibitions for this offense," speaking *nothing* of whether the felony continues to exist. (Lee Decl., Exh. J at p. 217). And further, the Arizona Terminology Page further provides that the term "dismissed" (as used in the order) means "[t]his is not a conviction." (Id., at p. 215).

17

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-cv-07653-JD

SEILER EPSTEIN LLP

And most pointedly, in Plaintiff Jones's case, the Texas court's order after his successful period of probation stated: "It is therefore the order of the court that the defendant be and is hereby permitted to withdraw his plea of guilty, the indictment against the defendant be and at the same is hereby dismissed and the Judgment of Conviction be hereby set aside as provided by law." (Jones Decl., ¶ 10; Jones Exh. A). Mr. Matsumoto agreed that the criminal records they consulted indicated that the final disposition of Mr. Jones's case was that it was "dismissed" with a further descriptor that the conviction had been "set aside." (Matsumoto Depo. at 101:18 – 102:14; Lee Decl., Exhs. G at p. 2, and Exh. I at p. 162). And again, Mr. Matsumoto testified that they would look at the NICS terminology for the State of Texas to determine what "set aside" means to determine his eligibility. (Matsumoto Depo. at 102:24 – 103:10). But in consulting the "Texas Terminology Page" of that binder, both of the terms "dismissed" and "set aside" are expressly stated to mean "This is not a conviction." (Id., at 105:5-25; Lee Decl. Exh. K, at pp. 228, 231).[4] And therefore, none of this actually matters, because notwithstanding this somewhat pointless exercise in attempting to determine whether a felony still exists under Texas law, it doesn't *really* matter to the Department, as they simply fall back to their position that Penal Code § 29800 prevents anyone convicted of a felony in another state to be prohibited. (Matsumoto Depo. at 105:2 – 107:3).

When asked the natural question that follows, which is why bother to consult the NICS binder at all if those state-specific terminologies ultimately do not matter to the Department of Justice, his answer was unsatisfactory. "We only use it for reference. It's only reference material." (Matsumoto Depo. at 107:4-12.)

In fact, the Department had already gone through the meaningless exercise of trying to determine whether Mr. Jones was prohibited *under Texas law* from owning a firearm by virtue of his conviction. The FBI analyst's answer to the DOJ's inquiry was, "The completion of probation in Texas followed up by a subject receiving a conviction set aside is not a ROR *but it does remove the conviction*. The DOA would no longer be prohibiting for firearms purposes." (Lee Decl. Exh. H at p.

---

[4] Indeed, the "Texas Terminology Page" states that "Set Aside" means where "[a] judge discharges the defendant from community supervision and sets aside the verdict or permits the defendant to withdraw his plea and dismisses the charge. […] This is not a conviction." (Lee Decl., Exh. K at p. 231). This is precisely what happened in Mr. Jones's case.

160, emphasis added). But the DOJ simply ignored this finding. All of this suggests that these purported efforts to determine whether a conviction exists under another state's law are simply designed to confirm the Department's preordained result. For if another state considers the conviction to exist, the Department can rely upon that fact to justify their result, but if the other state considers the conviction *not* to exist, then the Department merely falls back to the literal language of Pen. Code § 29800 to deny the right. This is simply a "heads-I-win, tails-you-lose" game, in which no matter what another state says, here in California, once you are a felon, you are always a felon.[5]

If "the laws of that particular state where the conviction occurred apply" (Lee Decl. Exh. C at p. 080), then the State must not only consider the fact of conviction itself, but the fact of a vacated, set aside or dismissed conviction as well. This is supported by federal law interpreting the federal statute prohibiting the federal statute prohibiting possession of a firearm by convicted felons generally, 18 U.S.C. § 922(g)(1), which contains an important and relevant qualification:

> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. *Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction* for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921, subdiv. (a)(20)(B) (emphasis added). The courts have held that the second sentence, "the exemption clause," is to be determined according to the state where the conviction originated as well. *Beecham v. United States*, 511 U.S. 368, 114 S.Ct. 1669 (1994); *Caron v. United States*, 524 U.S. 308, 313, 118 S.Ct. 2007 (1998); *see also*, *United States v. Fowler*, 198 F.3d 808, 809–10 (11th Cir. 1999).

**B.  PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR CLAIM ALLEGING VIOLATION OF THE FULL FAITH AND CREDIT CLAUSE.**

The core question presented here is whether California is required to honor the judgments of

---

[5]And, as discussed in the argument regarding the treatment of California felony convictions with respect to the Privileges and Immunities Clause, *infra* at pp. 21-25, this isn't even true. For California "deems" a felony conviction not to exist, when it clearly did, when considering post-conviction felony wobblers reduced to misdemeanors to restore firearms rights to felons convicted here (Matsumoto Depo. at 69:7-17). But California is unwilling to do so when it comes to convictions deemed not to exist under the laws of other states. (Id., at 70:18-23; 110:20-23).

**SEILER EPSTEIN LLP**

19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-CV-07653-JD

courts in other states that have set aside or vacated the plaintiffs' underlying felony convictions, and expressly restored their Second Amendment rights to them. Article IV, section 1 of the United States Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." "That Clause requires each State to recognize and give effect to valid judgments rendered by the courts of its sister States." *V.L. v. E.L.*, -- U.S. --, 136 S.Ct. 1017, 1020 (2016). The Supreme Court has explained that the "animating purpose" of this Clause was:

> to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin.

*Baker v. Gen. Motors Corp.*, 522 U.S. 222, 232, 118 S.Ct. 657, 663 (1998) (quoting *Milwaukee County v. M.E. White Co.*, 296 U.S. 268, 277, 56 S.Ct. 229 (1935)).

*Baker* made it clear to distinguish the Clause's command as between legislative acts of other states, and state court judgments. Specifically, the Court stated that the Clause "does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.'" *Baker*, 522 U.S. at 232 (citing *Pacific Employers Ins. Co. v. Industrial Accident Comm'n*, 306 U.S. 493, 501, 59 S.Ct. 629, 632 (1939)). The Court further clarified: "Regarding judgments, however, the full faith and credit obligation is exacting. A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land." *Baker*, 522 U.S. at 233 (citing *Matsushita Elec. Industrial Co. v. Epstein*, 516 U.S. 367, 373, 116 S.Ct. 873 (1996), and *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 485, 102 S.Ct. 1883, 1899 (1982)).

Importantly, the Court held that there is no "roving public policy exception" to the full faith and credit due judgments, and that the Clause orders submission even to the hostile policies reflected in the judgment of another state. *Baker*, 522 U.S. at 233. See also, *Estin v. Estin*, 334 U.S. 541, 546 (1948); *Williams v. North Carolina*, 317 U.S. 287 (1942) (requiring North Carolina to recognize change in marital status effected by Nevada divorce decree contrary to the laws of North Carolina); *V.L. v. E.L.*, 136 S.Ct. at 1020 (a state may not disregard the judgment of a sister state because it

20

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-cv-07653-JD

SEILER EPSTEIN LLP

deems it to be wrong on the merits) (citing *Milliken v. Meyer*, 311 U.S. 457, 462, 61 S.Ct. 339 (1940)).

Here, the criminal cases of Messrs. Linton, Stewart, and Jones ended in final judgments that conclusively terminated those matters. (Linton Exhs. A and B; Stewart Exh. A; Jones Exh. A). These are judgments of other states, in that they constituted the full and final disposition of those matters. They are judgments that must be honored without regard or reference to policy. Defendants' policies refusing to honor these judgments of other states, therefore, violate the Constitution's Full Faith and Credit Clause, and its enabling statute, 28 U.S.C. § 1738.

**C.     PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR CLAIM ALLEGING VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE (ART. IV, § 2) AND THE PRIVILEGES OR IMMUNITIES CLAUSE (AMEND. XIV).**

As noted above, the Department's position, which purports to follow Pen. Code § 29800 literally, is not even faithfully applied *here*. For California has its own process in place by which persons who have suffered felony convictions, where the crimes are wobblers and are subsequently reduced to misdemeanors pursuant to Pen. Code § 17(b), will have their firearms rights restored to them. A "wobbler" is an offense that is chargeable, or in the discretion of the court, punishable as either a felony or a misdemeanor; that is, they are punishable either by a term in state prison or by imprisonment in county jail or by fine. *Sannmann v. Department of Justice*, 47 Cal.App.5th 676, 679 n.2 (2020) (citing *People v. Park*, 56 Cal.4th 782, 789 (2013)). "We point out that when a prior offense is a "wobbler," a plea or verdict does not establish whether it is a felony; rather the sentence does." *People v. Williams*, 49 Cal.App.4th 1632, 1639 n.2 (1996); *see also*, *United States v. Fitzgerald*, 935 F.3d 814, 816 (9th Cir. 2019) (a court must look to how the defendant was actually punished). And as the Department itself acknowledges, "[a] reduction to a misdemeanor pursuant to PC Section 17 restores the person's right to possess a firearm." (Lee Decl. Exh. C at p. 081). *See also*, *People v. Gilbreth*, 156 Cal.App.4th 53, 57-78 (2007) (reversing conviction for possession of a firearm by a felon). Mr. Matsumoto testified that this manner in which some former felons in California have their firearms rights restored to them here is "frequent." (Matsumoto Depo. at 67-22 – 68:15).

In other words, California engages in the fiction that certain felony convictions incurred here

21

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT | CASE NO. 3:18-cv-07653-JD

are "deemed" not to have occurred in the first place, when they are subsequently reduced to misdemeanors pursuant to Pen. Code § 17(b). (Matsumoto Depo. at 69:7-17). But when it comes to convictions suffered in *other* states, subsequent action deeming the conviction not to exist is simply ignored. (Id., at 69:20 – 70:1; 70:18-23). And while the Department gives lip service to the precept that "the laws of the particular state where the conviction occurred apply," ultimately it does not matter, for California simply disregards any other state's post-conviction nullification of the conviction, relying on its fallback position that Pen. Code § 29800 controls absolutely when it comes to *out-of-state* former felons, as discussed at length above. This is simply discrimination, favoring non-violent California felons who are able to have their firearms rights restored to them, while ignoring the rights of non-violent former felons convicted in other states who have no remedy absent a gubernatorial or "presidential pardon." (Richards Decl., ¶ 5).

This disparate and favorable treatment of California former felons, who have a path to regaining a fundamental constitutional right, while denying *any* path to out-of-state former felons, violates the Privileges and Immunities Clause, art. IV, § 2 of the Constitution, and the Privileges or Immunities Clause of the Fourteenth Amendment, because the policy violates, in differing respects, the constitutional right to travel as set forth in *Saenz v. Roe*, 526 U.S. 499, 119 S.Ct 1518 (1999), as follows.

### 1.    Defendants' Policies Violate Plaintiff Linton's Right to Travel to California Under Art. IV § 2 of the Constitution.

The Privileges and Immunities Clause, also known as the "Comity Clause," states, "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const., art. IV, § 2, cl. 1. "The primary purpose of this clause, like the clauses between which it is located—those relating to full faith and credit and to interstate extradition of fugitives from justice—was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948).

In *Saenz*, the Court's most substantive case reaffirming the constitutional right to travel, the Court considered a challenge to a California statute limiting the welfare benefits available to new residents of the state. 526 U.S. at 492. Through Justice Stevens's majority opinion affirming the

SEILER EPSTEIN LLP

Ninth Circuit in enjoining the statute, the case largely stands for and affirms a constitutional right to travel. In discussing this right, the majority noted that a right to travel, "firmly embedded in our jurisprudence[,]" embraces at least three different components. *Id*. at 498-99. The first component is the right of a citizen to enter and leave another state. The second component is the right to be treated "as a welcome visitor rather than an unfriendly alien when temporarily present in the second state. This second component is protected by the Privileges and Immunities Clause of Art. IV, § 2 of the Constitution. "Thus, by virtue of a person's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits." 526 U.S. at 501.

This "second component" applies to plaintiff Linton, as he currently resides in Nevada. His move to Nevada this year was done for mixed motives, but a very real and substantial factor that motivated his move was because California still considers him to be a "felon," prohibited from owning or purchasing firearms." (Linton Decl., ¶ 3.) That he cannot exercise an important and fundamental constitutional right available to other law-abiding citizens, until this matter may be resolved, was an important reason for moving. (Id.) However, he continues to have a residential interest here, including a longstanding mining claim (i.e., an annual lease) in a remote property in Placer County. (Id., ¶ 4.) Though he wishes to return to California to live someday, he is unwilling to surrender his constitutional rights in order to do so. (Id., ¶ 6.)

Defendants' policies which effectively allow persons convicted of felony wobblers in California to regain their firearms rights, by engaging in the legal fiction that a § 17(b) reduction deems the felony conviction not to have occurred, while refusing to honor other states' final judgments that those convictions were similarly nullified, violates Plaintiff Linton's right to reenter the state without forfeiting a substantial liberty interest.

### 2. Defendants' Policies Violate All Individual Plaintiffs' Right to Travel to California Under the Fourteenth Amendment.

Returning to *Saenz*, the "third component" of the right to travel, as Justice Stevens discusses in the majority opinion, is the right of a newly arrived citizen to the same privileges and immunities enjoyed by citizens of that same state, a right protected not only by the new arrival's status as a state citizen, but also by his or her status as a citizen of the United States. 526 U.S. at 502. This is a right

SEILER EPSTEIN LLP

that is protected by the Privileges or Immunities Clause of the Fourteenth Amendment. Therefore, the Court concluded, the statute at issue unconstitutionally discriminated between established and newly-arrived residents of California. *Id*. at 505. And this discriminatory treatment of residents under this component was subject to strict scrutiny. *Id*. (citing *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331 (1969) (any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional.)) In *Saenz*, which was ultimately decided under this third component of the right to travel, California had imposed a durational residency requirement on welfare benefits by limiting those benefits during a recipient's first year of California residency to the amount that the recipient would have received in the state of his prior residence. 526 U.S. 489. The Court held that the statute unconstitutionally discriminated between old and newly arrived residents of California. *Id.*, at 505.

Under a third-component claim involving the right to travel, strict scrutiny should apply. *Shapiro*, 394 U.S. at 634. A statute that unreasonably burdens the right to travel is subject to strict scrutiny and will be struck down as unconstitutional "unless shown to be necessary to promote a compelling governmental interest." *Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 262, 94 S.Ct. 1076 (1974); *Attorney General of N.Y. v. Soto-Lopez*, 476 U.S. 898, 904–05, n.4, 106 S.Ct. 2317 (1986). The heavy burden of justification is on the State, and the court will closely scrutinize the challenged law in light of its asserted purposes. *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995 (1972).

Here, defendants' policies which allow the restoration of firearm rights to persons convicted of less serious, non-violent felonies in California, while denying any recourse or remedy (except a "presidential pardon" – *see* Richards Decl., ¶ 5), is discriminatory and cannot withstand such scrutiny. There is no reason for the State to permit a § 17(b) reduction to a misdemeanor here, which would allow the restoration of Second Amendment rights, while purporting to apply an inflexible, literal application of Pen. Code § 29800 to anyone convicted elsewhere, when the offenses were substantially the same. For example, a prior felony conviction for evading a police officer under California Vehicle Code § 2800.2 cannot form the basis for a felon in possession of a firearm charge, where the underling conviction had been reduced to a misdemeanor. *Gilbreth*, 156 Cal.App.4th at

SEILER EPSTEIN LLP

SEILER EPSTEIN LLP

57. Yet, Plaintiff Linton, who was convicted of an analogous crime in Washington State, has absolutely no recourse or remedy except a "presidential pardon" (Richards Decl., ¶ 5). This is simply a policy that favors persons convicted of non-violent felonies in California, over people convicted of similar crimes in other states.

Plaintiff Stewart was convicted of third degree burglary in Arizona, a Class C felony. In California, the analogous crime would be second degree (commercial) burglary, a wobbler under Pen. Code §§ 460 and 461. A person convicted of that crime in California could thus have the conviction reduced to a misdemeanor, and have their firearms rights restored.

And Plaintiff Jones was convicted of "credit card abuse," a third degree felony under Texas law. And while there is no such crime in California, the closest analogue might be fraudulent use of a credit card, Pen. Code § 484g, a wobbler. Pen. Code § 489.

Had plaintiffs been convicted here of similar crimes 30 years ago, they doubtless would be able to have their rights restored to them. But because the convictions emanated from other states, the Department applies section 29800(a) literally without regard to any subsequent action. The issue here is the disparate treatment of citizens. And thus, no matter what justification the State may use to attempt to prohibit felons from owning firearms in the first place, that is not our concern with regard to this claim. Any public safety justifications regarding sections 29800(a) and 30305 do not address the disparity in treatment, and the lack of remedies available to persons convicted here, as opposed to any other state. Either Pen. Code §§ 29800 and 30305 are applied evenly, or they are not, and if not, strict scrutiny demands the State to justify why that is.

## IV.   CONCLUSION

For the foregoing reasons, plaintiffs respectfully submit that summary judgment should be entered in their favor on all claims. In the alternative, partial summary judgment should be entered in their favor on each count respectively.

Dated: August 26, 2022

SEILER EPSTEIN LLP

/s/ George M. Lee
George M. Lee
Attorneys for Plaintiffs