George M. Lee (SBN 172982)
    gml@seilerepstein.com
**SEILER EPSTEIN LLP**
275 Battery Street, Suite 1600
San Francisco, CA 94111
Phone: (415) 979-0500
Fax:   (415) 979-0511

Attorneys for Plaintiffs
CHAD LINTON, PAUL MCKINLEY STEWART,
KENDALL JONES, FPC ACTION FOUNDATION,[1]
FIREARMS POLICY COALITION,
SECOND AMENDMENT FOUNDATION,
THE CALGUNS FOUNDATION and MADISON
SOCIETY FOUNDATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAD LINTON, et al.,<br><br>    Plaintiffs,<br><br>vs.<br><br>ROB BONTA, in his official capacity as Attorney General of California, et al.,<br><br>    Defendants. | Case No. 3:18-cv-07653-JD<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[FRCP 56]**<br><br>Courtroom 11, 19th Floor<br>Judge:    Hon. James Donato |

---

[1] Plaintiff originally named herein as "Firearms Policy Foundation" changed its name to FPC Action Foundation while this case was administratively stayed. Plaintiffs are filing a Notice of Party Name Change and Supplemental Corporate Disclosure Statement pursuant to N.D. Civ. L.R. 3-15 herewith.

TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................................1

II. ARGUMENT IN REPLY .....................................................................................................2

    A.  DEFENDANTS FAIL TO MEET THEIR BURDEN TO OVERCOME PLAINTIFFS' CHALLENGES TO THE STATE'S POLICY UNDER THE SECOND AMENDMENT. ....................2

        1.  Individual Plaintiffs—As Americans—Belong to "the People" to which the Constitution Refers. ..............................................................2

        2.  Plaintiffs' Challenge to Defendants' Policy is Not Presumptively Foreclosed. ....3

        3.  Defendants' Policy Has No Relevant Historical Predicate. ..................................4

        4.  Plaintiffs' Convictions Were Not For Crimes of Violence. ..................................8

    B.  REQUIRING A STATE TO HONOR ITS FULL FAITH AND CREDIT CLAUSE OBLIGATION TO RECOGNIZE JUDGMENTS RENDERED BY COURTS IN OTHER STATES IS NOT SUBORDINATION OF THE STATE'S CRIMINAL JUSTICE SYSTEM. ..........................8

    C.  DEFENDANTS FAIL TO DISPUTE THEIR DISPARATE TREATMENT OF OUT-OF-STATE FELONY CONVICTIONS WHICH VIOLATES THE CONSTITUTIONAL RIGHT TO TRAVEL. ...............................................................................................11

    D.  DEFENDANT WILSON IS NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY. ..........13

    E.  THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING. ...................................................14

III. CONCLUSION ..................................................................................................................15

SEILER EPSTEIN LLP

ii

PLAINTIFFS' REPLY MEMO. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-07653-JD

TABLE OF AUTHORITIES

**Cases**

*Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981) ...........................................................................11

*Assoc. Gen. Contractors of Am. v. Cal. Dept. of Transp.*, 713 F.3d 1187 (9th Cir. 2013)..................15

*Baker v. Gen. Motors Corp.*, 522 U.S. 222, 118 S.Ct. 657 (1998)........................................................9

*Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016),
    *cert. denied*, 137 S.Ct. 2323 (U.S. Jun. 26, 2017) .......................................................................3, 5

*Brown v. City of L.A.*, 521 F.3d 1238 (9th Cir. 2008) .......................................................................15

*Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128 (9th Cir. 2014)........................13, 14

*Dept. of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 119 S.Ct. 765 (1999) ..............15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................................2, 3, 4

*Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441 (1908) .........................................................................13

*Farmland Dairies v. Barber*, 65 N.Y.2d 51, 478 N.E.2d 1314 (1985) ...................................................9

*Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007) ....................................................................9, 10

*Folajtar v. Attorney General*, 980 F.3d 897 (3d Cir. 2020) ..................................................................5

*Groseclose v. Plummer*, 106 F.2d 311 (9th Cir. 1939).......................................................................10

*Hunt v. Washington State Apple Advertising Comm'n*,
    432 U.S. 333, 97 S.Ct. 2434 (1977)...............................................................................................15

*Huntington v. Attrill*, 146 U.S. 657 (1892) ..........................................................................................8

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019).................................................................................3, 6

*Los Angeles Cty. Bar Ass'n v. Eu*, 979 F.2d 697 (9th Cir. 1992)........................................................14

*McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020 (2010) .................................................13

*Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975 (9th Cir. 2013)..........................................15

*NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct.1163 (1958)...................................................................14

*Nelson v. George*, 399 U.S. 224 (1970)...............................................................................................8

*New York State Rifle & Pistol Ass'n Inc. v. Bruen*,
    597 U.S. ___, 142 S.Ct. 2111 (2022)...................................................................................... *passim*

iii

*People v. Laino*, 32 Cal.4th 878 (2004)..................................................................................10

*People v. Park*, 56 Cal.4th 782 (2013) .................................................................................13

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965 (1985) ..............................11

*Planned Parenthood Arizona, Inc. v. Brnovich*, 172 F.Supp.3d 1075 (D. Ariz. 2016).......14

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006).........15

*Saenz v. Roe*, 526 U.S. 489, 119 S.Ct. 1518 (1999) ........................................................11, 12

*Sannmann v. Department of Justice*, 47 Cal.App.5th 676 (2020) ........................................12

*Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S.Ct. 1142 (2009) ............................14, 15

*United States v. Phillips*, 827 F.3d 1171 (9th Cir. 2016).......................................................4

*United States v. Torres*, 789 F.App'x 655 (9th Cir. 2020) ....................................................4

*United States v. Verdugo–Urquidez*, 494 U.S. 259 (1990)....................................................2

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) .....................................................5

*V.L. v. E.L.*, 577 U.S. 404, 136 S.Ct. 1017 (2016) ..........................................................8, 10

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ..............................15

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).........................................................14


**Constitutional Provisions**

U.S. Const., Amend. II ................................................................................................. *passim*

U.S. Const., Amend. XI......................................................................................................13, 14

U.S. Const., Amend. XIV .............................................................................................1, 11, 12

U.S. Const., art. IV, § 1 .................................................................................................1, 8, 9, 11

U.S. Const., art. IV, § 2 .........................................................................................................1, 11

//

//

//

iv

PLAINTIFFS' REPLY MEMO. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-07653-JD

**Statutes**

1776 Mass. Gen. Laws 484..................................................................................................................7

18 U.S.C. § 922(g) ..............................................................................................................................4

28 U.S.C. § 1738.............................................................................................................................1, 9

Cal. Code Civ. Pro. § 577 ...................................................................................................................9

Cal. Pen. Code § 1203.4....................................................................................................................12

Cal. Pen. Code § 17(b)................................................................................................................12, 13

Cal. Pen. Code § 29800 .................................................................................................................3, 4

Cal. Pen. Code § 30305 .................................................................................................................3, 4

**Other Authorities**

4 THE AMERICAN HISTORICAL REVIEW 282 (1899).................................................................7

ACTS AND LAWS OF HIS MAJESTY'S PROVINCE OF NEW-HAMPSHIRE IN NEW ENGLAND 2 (1759)......7

Cornell, Saul, *Don't Know Much About History: The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002)........................................................................7

Greenlee, Joseph G.S., *The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) .....................................................5, 6, 7

Kates, Don B., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1984) .............................................................................................6

Kates, Don B., *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339 (2009).........................................................................................5, 6

Marshall, C. Kevin, *Why Can't Martha Stewart Have a Gun?* 32 Hav. J. L. Pub. Policy 695 (2009)................................................................................7

v

PLAINTIFFS' REPLY MEMO. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-07653-JD

## I. INTRODUCTION

Attorney General Rob Bonta, the Attorney General of the most populous state in the Union, believes that a certain category of persons may be permanently deprived of an enumerated constitutional right—without any trial or adjudication here in California—simply by his own determination that those citizens are definitionally excluded from "the People" to which the Constitution refers. The Attorney General's exclusion is both ignoble, wrong, and foreclosed by *Heller*, which held that the right to bear arms is one presumptively held by *all Americans*.

The State has otherwise failed to meet its burden to show that its policy concerning the treatment of out-of-state former felons, whose underlying convictions have been set aside, vacated, or dismissed, is consistent with the Nation's historical tradition of firearm regulation under *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 597 U.S. ___, 142 S.Ct. 2111 (2022). The "virtuous citizen" theory upon which the State substantively relies makes for interesting academic discussion, but defendants do not actually cite to any founding-era laws, regulations, or practices that deprived non-dangerous persons, convicted of non-violent crimes, from the right to bear arms for the remainder of their lives.

Moreover, defendants' pure policy arguments have no application to the recognition of judgments from other states under the Full Faith and Credit Clause, art. IV, sec. 1 of the U.S. Constitution, and its enabling statute, 28 U.S.C. § 1738. And since individual plaintiffs were not convicted of any crimes here, simply forcing California to recognize the validity of final judgments of other states in no way undermines its own criminal justice system, which is not implicated at all.

Finally, defendants sidestep, and completely ignore, the State's disparate treatment of persons whose former felony convictions from other states have been set aside or vacated, from that of citizens whose "wobbler" convictions in California are subsequently reduced to misdemeanors, and then set aside to restore the right to bear arms. The plain fact is, under those circumstances, persons convicted of certain felonies in California have a path to regain their rights, while, under defendants' policy, persons who were similarly convicted in other states are *completely foreclosed*. Defendants fail to address this practice, which violates the Privileges and Immunities Clause (art. IV, sec 2) and the Privileges or Immunities Clause of the Fourteenth Amendment.

1
PLAINTIFFS' REPLY MEMO. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-07653-JD

Contrary to defendants' rather dismissive suggestion, this case does not seek to remedy an "inconvenience" that is "incidental" to the law. (Opp. at 23:16). Plaintiffs are seeking to regain the full blessings of citizenship, including an important, fundamental right guaranteed by the Constitution. Their motion should be granted.

## II.   ARGUMENT IN REPLY

### A.   DEFENDANTS FAIL TO MEET THEIR BURDEN TO OVERCOME PLAINTIFFS' CHALLENGES TO THE STATE'S POLICY UNDER THE SECOND AMENDMENT.

#### 1.   Individual Plaintiffs—As Americans—Belong to "the People" to which the Constitution Refers.

The initial thrust of defendants' opposition to plaintiffs' Second Amendment claims is that the individual plaintiffs, as former convicted felons, do not belong to "the People" to which the Second Amendment, and by implication, to which the entire Constitution applies. (Opp. at 11). But this is directly at odds with *District of Columbia v. Heller*, 554 U.S. 570 (2008), which stated that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to *all Americans*." 554 U.S. at 581 (emphasis added). As further made clear in *Heller*, "in all six […] provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." 554 U.S. at 580. *Heller* continued:

> "'[T]he people' seems to have been a term of art employed in select parts of the Constitution .... [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."

*Heller*, 554 U.S. at 580 (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)).

In the context of felon prohibition laws, in *Kanter v. Barr*, then-Judge Barrett specifically analyzed and rejected the argument that felons were categorically excluded from the definition of "the People," when she stated: "Neither felons nor the mentally ill are categorically excluded from our national community. That does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right

2

at all." *Kanter*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting).

Likewise, in *Binderup v. Attorney General*, 836 F.3d 336, 370-71 (3d Cir. 2016), *cert. denied*, 137 S.Ct. 2323 (U.S. Jun. 26, 2017), Judge Hardiman's concurring opinion also rejected the government's argument that the appellants' misdemeanor convictions placed them outside of the class of persons whose right to bear arms was protected (i.e., "the People"). This was more closely tied to his rejection of the concept of the "virtuous citizen" limitation on Second Amendment rights, discussed more at length below. In *Binderup*, the *en banc* opinion held that the plaintiffs were not foreclosed from possessing arms, because they were not part of the historically barred class of violent and otherwise dangerous persons. 836 F.3d at 349-51.

### 2. Plaintiffs' Challenge to Defendants' Policy is Not Presumptively Foreclosed.

Defendants appear to understand that it is their burden under *Bruen* to justify the State's policy regarding the treatment of out-of-state former felony convictions as being consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 142 S.Ct. at 2130. And therefore, defendants cannot simply rest upon their policy as a "presumptively lawful regulatory measure" (Opp. at 11:20), for even if *Heller* did not intend to "cast doubt[s] upon longstanding prohibitions on the possession of firearms by felons[,]" among other restrictions, *Heller*, 554 U.S. at 626, *Bruen* still requires defendants to show that it is historically justified.

But this dicta from *Heller* does not foreclose any particular challenge to a state's firearm laws or policies. Rather, while presuming certain laws would be constitutional, the Court was leaving for a future date the resolution of these issues. That time is now. And it should also be noted that in *Bruen*, the Court *twice* stated its holding that the government has the burden of justifying its regulation by reference to the Nation's historical traditions, 142 S.Ct. at 2126, 2130, but never once stated that the government starts with the benefit of any presumption in meeting that burden, nor did the Court recognize any exceptions to its holding.

In any event, the present case does not present a facial challenge to Pen. Code sections 29800 and 30305. And thus, defendants' Opposition, which relies on their characterization of "the challenged statutes" as presumptively lawful measures, misses the nature of these claims. Plaintiffs seek to enjoin defendants' *policies and enforcement practices* which prevent them from keeping

3

firearms, for all lawful purposes, on an as-applied basis, and not the statutes alone. Such as-applied relief is not foreclosed, even if it ultimately involves the purported "longstanding prohibitions on the possession of firearms by felons" as mentioned in dicta by *Heller*, 554 U.S. at 626-27. In *United States v. Torres*, 789 F.App'x 655, 657 (9th Cir. 2020), Judge Lee, concurring in the judgment, stated: "I do not believe either the Supreme Court or the Ninth Circuit has explicitly held that felons are categorically barred from bringing as-applied Second Amendment challenges to [18 U.S.C.] § 922(g)(1). While facial challenges to § 922(g)(1) are foreclosed, the door appears to remain ajar on whether someone can pursue an as-applied Second Amendment challenge in circumstances where the underlying felony is so minor or regulatory in nature and has no analogue in the Founding era." And again, in *United States v. Phillips*, 827 F.3d 1171 (9th Cir. 2016), a pre-*Bruen* case, the Court recognized that "there are good reasons to be skeptical of the constitutional correctness of categorical, lifetime bans on firearm possession by *all* felons." *Id*. at 1174 (emphasis original).

Here, defendants' characterization of sections 29800 and 30305 as presumptively lawful, framed as if this were a facial challenge, misses the mark. As-applied challenges to the defendants' policies, even if they are ostensibly based upon sections 29800 and 30305, are not foreclosed.

### 3. Defendants' Policy Has No Relevant Historical Predicate.

On the merits of the matter, and addressing their burden which *Bruen* demands, defendants' Opposition argues that their policy is consistent with the Nation's historical tradition of firearm regulation. (Opp. at 13-16). But defendants point to no actual law, regulation, policy, or practice which actually disarmed non-dangerous (i.e., non-violent) citizens from the relevant, founding era.

Indeed, in plaintiffs' opening memorandum, we expressly laid out the case that any historical justification the Supreme Court relied on to declare felon bans "presumptively lawful" was rooted in the tradition of disarming violent and otherwise dangerous persons. Thus, even if prohibitions on violent felons may be presumptively lawful under *Heller*, prohibitions on nonviolent felons contradict the original understanding of the Second Amendment. As scholar Joseph Greenlee found and summarized in his extensive article which we have cited, "there is no tradition of banning peaceable citizens from possessing firearms. The historical justification the Supreme Court relied on to declare felon bans 'presumptively lawful' must be the tradition of disarming violent and

otherwise dangerous—not merely unvirtuous—persons." Greenlee, *The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 251 (2020).

The only historical argument of substance in defendants' Opposition is the suggestion that "[m]any historical scholars have concluded that 'the right to bear arms was inextricably … tied to the concept of a virtuous citizenry' and that, accordingly, the government could 'disarm[] unvirtuous citizens." (Opp. at 13:22 – 14:1, citing *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010)). But the "virtuous citizen theory" was not tied to the Second Amendment in the founding era. *See*, *Binderup v. Attorney General*, 836 at 371 ("This "virtue" standard—especially in the pliable version articulated by the Government—is implausible because the 'civic republican' view of the scope of the Second Amendment is wrong.") (Hardiman, J., concurring), *cert. denied*, 137 S.Ct. 2323 (U.S. Jun. 26, 2017); Greenlee at 275.

Defendants' references to the "virtuous citizen" concept, cited in journals and in cases which cited those journals,[2] were never supported by actual laws, regulations, or other citable prohibitions. "They are like the layers of a matryoshka doll, each nested layer successively larger with little at the core." *Folajtar v. Attorney General*, 980 F.3d 897, 916 (3d Cir. 2020) (Bibas, J., dissenting). For example, in Don Kates's work *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339 (2009) (cited in Opp. at 14:3-7), Professor Kates spoke in general terms about how "in classical republican thought, the right to arms was inextricably and multifariously linked to that of civic virtu (i.e., the virtuous citizenry). [¶] One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue." *Id.*, at 1359-60 (quoted in Opp. at 14:8-12). But digging deeper, Kates's article cited to no laws that were enacted which actually did deprive citizens from the right to bear arms based upon their virtue alone.

And Kates did note a pre-revolutionary tradition of forbidding "suspect groups" from having firearms, but the one footnote that he used to point out examples of this include pre-revolutionary

---

[2] We would note that in *Bruen*, the Supreme Court considered 15 actual laws, while in contrast, the "virtuous citizen" theory rests entirely on these law review articles from the 1980s to the 2000s.

Maryland disarming Catholics,[3] American state prohibitions depriving arms to black people, and English disarmament of English and Welsh Catholics. Kates, at 1360, n.122. Of course, these examples of disarming persons based upon racial or religious classifications can form no legitimate analogue to justify modern firearm prohibitions.

And therefore, defendants here fail to do what *Bruen* requires, which is to point to relevant founding-era laws and regulations that might support an historical analogue. 142 S.Ct. at 2132. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of *whether the two regulations* are 'relevantly similar.'" *Id*. (emphasis added). Here, beyond the idyllic concepts of a virtuous citizenry in theory and in vision, defendants can point to no founding-era laws, because there are none which may constitute an appropriate analogue. Indeed, as then-Judge Barrett found in her dissenting opinion in *Kanter*, "[t]he best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws." 919 F.3d at 454 (Barrett, J., dissenting). Judge Barrett continued: "The only evidence coming remotely close lies in proposals made in the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions. In recommending that protection for the right to arms be added to the Constitution, each of these proposals included limiting language arguably tied to criminality." *Id*.

And to dig even deeper, in the article which Judge Barrett cited for this proposition, Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1984), Kates again generalized that the founders did not consider felons to be within the common law right to bear arms, nor did they intend to confer any right upon them. *Id.*, at 266. But as Greenlee has pointed out, in that article "Professor Kates did not provide any examples of laws disarming 'unvirtuous' citizens […] and for support cited only his previous *Original Meaning* article, which did not include any examples of such laws either." Greenlee, at 276.

---

[3] As Greenlee has noted, one American tradition that they inherited from the English was the English tradition of disarming Catholics, based upon their perceived dangerousness to the crown, and to prevent armed insurrections. Greenlee, at 258-261.

To bring us full circle to plaintiffs' original thesis, those sources that are cited which purport to support the "virtuous citizen" theory can cite only examples of laws that were intended to disarm *dangerous* persons. For example, Saul Cornell's article *Don't Know Much About History: The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657 (2002) (cited in Opp. at 14:16-18), cites a Pennsylvania prohibition on "disaffected persons." Greenlee, at 277. But as we have already pointed out, those laws were intended to disarm dangerous persons. *Id*. This therefore illustrates our point.

And finally, whether any founding-era laws were intended to strip dangerous persons, or merely the "unvirtuous," nobody can point to any founding-era prohibitions that purported to strip dangerous persons from firearms ownership for the remainder of their lives. *See*, Greenlee at 268; C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?* 32 Hav. J. L. Pub. Policy 695 (2009). To the contrary, research shows that offenders in the founding era could often regain their rights upon providing securities (a financial promise, like a bond) of peaceable behavior. For example, individuals "who shall go armed offensively" in 1759 New Hampshire were imprisoned "until he or she find such surities of the peace and good behavior." ACTS AND LAWS OF HIS MAJESTY'S PROVINCE OF NEW-HAMPSHIRE IN NEW ENGLAND 2 (1759). Some states had procedures for restoring a person's right to arms. Connecticut's 1775 wartime law disarmed an "inimical" person only "until such time as he could prove his friendliness to the liberal cause." 4 THE AMERICAN HISTORICAL REVIEW 282 (1899). Massachusetts's 1776 law provided that "persons who may have been heretofore disarmed by any of the committees of correspondence, inspection or safety" may "receive their arms again … by the order of such committee or the general court." 1776 Mass. Gen. Laws 484. When the danger abated, the arms disability was lifted.

In sum, the "virtuous citizen" theory was never intended to apply to the Second Amendment, and most importantly, did not result in any tangible, citable examples of any actual founding-era prohibitions on the right to arms based upon virtue alone. The few examples that scholars do cite that intended to strip the "unvirtuous," were limited to those non-peacable, i.e., violent, persons. And in no circumstance can defendants or any scholar point to any *lifetime* prohibition on the right to keep and bear arms from the founding era.

### 4. Plaintiffs' Convictions Were Not For Crimes of Violence.

Finally, to buttress their argument that plaintiffs deserve to fall within a subset of persons who are prohibited because they are convicted of a felony, "whether violent or nonviolent" (Opp. at 15:25 – 16:1), defendants imply that individual plaintiffs Linton, Stewart and Jones can conceivably be considered "dangerous persons." (Opp. at 12:22-25). But common sense, a plain understanding of the laws of which they were convicted, and "the laws of that particular state where the conviction occurred" (Exh. 005) would disagree. Again, the Washington State Court expressly found Mr. Linton's underlying offense was not a violent offense. (Linton Exh. A at p. 2). Likewise, the Arizona court did not consider Mr. Stewart's offense to be a "Serious Offense" by setting it aside. (Ariz. Terminology Page, Lee Decl. Exh. J at p. 217). And if the State considers Mr. Jones's conviction for misusing a credit card without authorization to involve an "element of deceit that is dangerous" (Opp. at 12:26 – 13:1), by that standard, there is no such thing as a non-violent felony.

Plaintiffs here were never suspected of violence, and their non-violent offenses do not reflect any inherent inclusion within a category of "dangerous persons." There is no relevant historical support for lifetime prohibitions on non-violent, non-dangerous persons.

### B. REQUIRING A STATE TO HONOR ITS FULL FAITH AND CREDIT CLAUSE OBLIGATION TO RECOGNIZE JUDGMENTS RENDERED BY COURTS IN OTHER STATES IS NOT SUBORDINATION OF THE STATE'S CRIMINAL JUSTICE SYSTEM.

The thrust of defendants' Opposition here is that the Full Faith and Credit Clause "cannot require California to subordinate its criminal justice system and Penal Code based on the criminal justice laws of sister states." (Opp. at 18:15-16). But simply demanding that a state "recognize and give effect to valid judgments rendered by the courts of its sister states," *V.L. v. E.L.*, 577 U.S. 404, 136 S.Ct. 1017, 1020 (2016), when the felony conviction itself emanated from those other states, is hardly undermining a state's criminal justice system. Defendants greatly exaggerate what is at stake.

Defendants' cited cases of *Nelson v. George*, 399 U.S. 224 (1970) and *Huntington v. Attrill*, 146 U.S. 657 (1892) have no application here because plaintiffs are in no way asking this Court to compel the State of California to "enforce a foreign penal judgment." *Nelson*, 399 U.S. at 229. Plaintiffs are simply asking this Court to force California to recognize a judgment and give it its due

8

PLAINTIFFS' REPLY MEMO. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT
CASE NO. 3:18-cv-07653-JD

effect. *See*, *Farmland Dairies v. Barber*, 65 N.Y.2d 51, 57, 478 N.E.2d 1314, 1318 (1985) ("New York is not being asked by the State of New Jersey to enforce its penal laws. Quite the contrary, respondent wishes to recognize the New Jersey judgment as evidence of the misconduct underlying it.")

And on the related issue of foreign judgments, there is no subject matter limitation to the Full Faith and Credit Clause as defendants suggest. Defendants argue that "[t]he authorities cited by Plaintiff[s] with respect to recognizing foreign judgments do not save their case. Those cases do not involve criminal judgments and instead relate to products liability and family law scenarios." (Opp. at 19, fn.12). However, neither the Full Faith and Credit Clause, nor its enabling statute, 17 U.S.C. § 1738, make any subject matter limitations as to what constitutes judgments, and indeed, neither make express reference to "judgments" at all, but rather to the "records and judicial proceedings of every other state." Recognizing, however, that plaintiffs are here advancing the Supreme Court's jurisprudence as to "judgments" as opposed to the legislative acts of other states, *Baker v. Gen. Motors Corp.*, 522 U.S. 222, 232, 118 S.Ct. 657 (1998), it is enough to say that a "judgment" is "the final determination of the rights of the parties in an action or proceeding." Cal. Code Civ. Pro. § 577. In California, this commonly-understood definition of "judgment" extends to criminal cases as well. *People v. Wagner*, 2 Cal.App.4th 774, 779 (2016); *In re Sonia G.*, 158 Cal.App.3d 18, 22 n.5 (1984).

Defendants' argument that "[t]he Full Faith and Credit Clause does not preclude a state from determining its own laws or carrying out its public policy" (Opp. at 18:4-5), when tied into their earlier argument that "California has the sovereign right to develop its police powers" (Opp. at 17:24), sounds as if the State is attempting to make a policy argument. That argument is foreclosed by the Supreme Court cases cited in plaintiffs' Memorandum which order submission to the "hostile policies" reflected in the judgment of another state.

A generalized appeal to a state's sovereign power to enforce its own laws does not justify its refusal to recognize a foreign judgment. In *Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007), the State of Oklahoma attempted to make a similar argument, and failed. It specifically argued, similar to what defendants argue here, "that requiring Oklahoma to recognize an out-of-state

adoption judgment would be tantamount to giving the sister state control over the effect of its judgment in Oklahoma." *Id*. at 1153. The Tenth Circuit rejected that argument, and held that Oklahoma's "refusal to recognize final adoption orders of other states that permit adoption by same-sex couples" was unconstitutional. *Id*. See also, *V.L. v. E.L.*, 577 U.S. 404 (requiring Alabama to recognize a same-sex couple's adoption order awarding custody in Georgia).

Without expressly asserting what the "public policy" is that recognition of the out-of-state judgments would "preclude" (Opp. at 18:4-5), defendants allude generally to the State's police powers. (Opp.at 17:24). No matter how they frame it, however, defendants are attempting to pry a public policy exception from a prohibition the Supreme Court has made clear. Public policy is no reason to deny a person legal rights that have expressly been adjudicated elsewhere, no matter how much California or Oklahoma might not prefer the outcome.

Likewise, defendants' implied policy objectives associated with punishing persons convicted of crimes here, or enhancing their sentences based upon out-of-state convictions that have been expunged or pardoned, are not being called into question. And therefore, neither *Groseclose v. Plummer*, 106 F.2d 311 (9th Cir. 1939) nor *People v. Laino*, 32 Cal.4th 878 (2004) has any application here. *Groseclose* involved an appeal from the denial of a habeas petition, in which the petitioner claimed that the trial court was without jurisdiction to sentence him under a habitual criminal statute when his underlying convictions had been pardoned. 106 F.2d at 312-13. Similarly, *Laino* involved a three-strikes sentencing enhancement where the underlying conviction was an out-of-state conviction that had been discharged and dismissed following probation. 32 Cal.4th at 885. These cases are inapplicable to the present situation because plaintiffs here have not been convicted of any crime in California, and the prohibition of their right to exercise a fundamental constitutional right cannot and should not, in any way, be described as "punitive" in nature. Plaintiffs are not asking to overturn any California conviction, nor are they asking to set anyone free, or modify any "sentence" imposed. And thus, the "criminal justice system" is hardly being "subordinated" or undermined by the relief plaintiffs seek. On the other hand, if the stated policy objective of the State is indeed to "punish" people like the plaintiffs here by depriving them of a constitutional right, that even more begs the relief that plaintiffs seek. Summarily depriving plaintiffs of a fundamental

constitutional right as a form of *punishment*, without any trial, adjudicative process, fact-finding tribunal, or even an established administrative procedure, would be constitutionally indefensible.

Finally, defendants argue that "the Full Faith and Credit Clause does not require California to recognize criminal judgments from sister states because of its substantial contacts with the Individual Plaintiffs, which outweigh Plaintiffs' contacts with the states that had issued the set aside and dismissal orders." (Opp. at 19:16-19). Defendants cite no authority for the proposition that the Full Faith and Credit Clause requires any kind of balancing of contacts between the party to the underlying judgment and the state from which it originated, because there is no such authority. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965 (1985), cited in defendants' Opp. at 19:26 – 20:3), and *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981), from which the quote is derived, involved choice-of-law questions that were intertwined with personal jurisdiction questions. Neither case involved the recognition of an out-of-state judgment. These cases involving choice-of-law questions that are based on a party's minimum contacts with the state whose law was being applied have nothing to do with demanding that a state recognize and honor an out-of-state judgment, and therefore have no applicability here.

### C.  DEFENDANTS FAIL TO DISPUTE THEIR DISPARATE TREATMENT OF OUT-OF-STATE FELONY CONVICTIONS WHICH VIOLATES THE CONSTITUTIONAL RIGHT TO TRAVEL.

Addressing plaintiffs' Article IV § 2 and Fourteenth Amendment claims, defendants' Opposition argues that plaintiffs' claims based upon the constitutional right to travel "cannot stand" because "[t]he Supreme Court held in *Saenz* that the right to travel under the Fourteenth Amendment involves 'the right of the *newly arrived* citizen to the same privileges and immunities enjoyed by other citizens of the same state." (Opp. at 22:20-22 (emphasis original) (citing *Saenz v. Roe*, 526 U.S. 489, 502, 119 S.Ct. 1518 (1999)). Defendants' argument, which would pertain solely to the "third component" right to travel under *Saenz*, completely ignores the rest of that passage from *Saenz* which states: "That right is protected not only by the new arrival's status as a state citizen, but also by her status as a citizen of the United States." *Saenz*, 526 U.S. at 502. Defendants frame this as a matter of "standing" (Opp. at 22:23-26), yet they do not cite one single case which stands for the proposition that the right to travel under the third component of *Saenz* requires some "newly arrived" status as a matter of standing. That is because such a case does not exist.

Indeed, it would be quite the argument to say that a law which infringes upon the constitutional right to travel is somehow waived or forfeited after a period of time has elapsed. As Justice Stevens noted in *Saenz* itself, the purpose of the Fourteenth Amendment's Privileges or Immunities Clause was to "guarantee[] the rights of newly freed black citizens by ensuring that they could claim the state citizenship of any State in which they resided and by precluding that State from abridging their rights of national citizenship." 526 U.S. at 499 n.15. Does defendants' argument mean that the freedmen who were protected by the Fourteenth Amendment's right to travel somehow lost its protection after moving to another state for a certain period of time? Of course not. The only reason why *Saenz* mentions "newly arrived" citizens at all is likely because the case involved California's statute which limited maximum welfare benefits to "newly arrived residents." 526 U.S. at 492.

Putting standing issues aside, defendants' Opposition wholly ignores the central thesis of plaintiffs' right-to-travel claim, which is the discriminatory treatment their policy affords to persons with out-of-state felony convictions, while allowing persons convicted of certain felony offenses in California to have their rights restored under section 17(b) of the Penal Code. In their opening Memorandum, plaintiffs challenged defendants to address this disparity in treatment. Specifically, plaintiffs asserted that under this third-component claim involving the right to travel, strict scrutiny should apply, and that the burden to justify this disparity in treatment falls on the government. (Memo. at 24:12-19). Defendants completely avoid this challenge to justify their disparate treatment, instead simply choosing to deny any discrimination by arguing that plaintiffs' situation is "closer instead to persons with straight felonies whose convictions have been set aside under [Penal Code] section 1203.4. Just as the Individual Plaintiffs are not eligible to possess firearms, neither are persons convicted of straight felonies with 1203.4 set asides." (Opp. at 23:7-11). But the entire point here is that plaintiffs were not convicted of "straight felonies." "A 'straight felony' is an offense punishable only as a felony (i.e., by death or imprisonment in state prison)." *Sannmann v. Department of Justice*, 47 Cal.App.5th 676, 679 n.2 (2020). "By contrast, a 'wobbler' is an offense that is 'chargeable or, in the discretion of the court, punishable as either a felony or a misdemeanor; that is, they are punishable either by a term in state prison or by imprisonment in county jail and/or

by a fine.'" 47 Cal.App.5th at 679 (citing *People v. Park*, 56 Cal.4th 782, 789 (2013)). And again, defendants admit that a reduction of a felony conviction to a misdemeanor under Pen. Code § 17(b) ordinarily restores that person's right to possess a firearm (Lee Decl. Exh. C at p. 081), and that the manner in which this is done here in California is "frequent." (Matsumoto Depo. at 67-22 – 68:15).

In plaintiffs' opening Memorandum, we asserted that each of the underlying convictions was the equivalent to a wobbler in California because each California equivalent crime was reducible to a misdemeanor. (Memo. at 24:23 – 25:11). Defendants do not appear to dispute this, but by insisting that the individual plaintiffs' situation is analogous to persons convicted of "straight felonies" here in California, defendants are just ignoring this argument and appear to concede the point. Defendants have neither adequately addressed, nor at all justified the disparate treatment between plaintiffs' circumstances and those of a person who is able to have their firearms rights restored after the conviction of a felony wobbler in California.

Finally, defendants remark that their policy, if disparate, represents a mere "inconvenience" which is "incidental" to their generalized interests in "public safety, crime prevention, and preventing gun violence." (Opp. at 23:16-18). Plaintiffs' inability to exercise a fundamental constitutional right to self-defense is not an "inconvenience" that is "incidental." The right to keep and bear arms is a right fundamental to our system of ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742, 791, 130 S.Ct. 3020 (2010), and defendants' attempt to reduce this right to a "convenience" in failing to justify their policy is telling.

D.   **DEFENDANT WILSON IS NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY.**

Defendants' Opposition claims that defendant Robert Wilson is immune under the Eleventh Amendment. (Opp. at pp. 23-24). But it is well understood that state officials may be sued in their official capacities for prospective injunctive and declaratory relief arising from violations of federal laws. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441 (1908). This exception to Eleventh Amendment immunity applies where the state official has "some connection with the enforcement of the act." *Id.*, 209 U.S. at 157; *Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2014).  The connection of the state official to the act at issue "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for

enforcing the challenged provision will not subject an official to suit." *Id*. at 1134 (quoting *Los Angeles Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)). And a direct connection to establish a claim for prospective injunctive relief under *Ex Parte Young* is established by enforcement with the law, on in this case, policy, at issue. *Eu*, 979 F.2d at 704; *Coal. to Defend Affirm. Action*, 674 F.3d at 1134 (defendant had a 'fairly direct' connection to enforcement of a provision amending the California Constitution); *Planned Parenthood Arizona, Inc. v. Brnovich*, 172 F.Supp.3d 1075, 1096 (D. Ariz. 2016) (attorney general's conduct was not a "single link" in an attenuated chain of possibilities, but his actions formed a causal chain that resulted in constitutional injury).

In the present case, Deputy Attorney General Wilson had that direct involvement with the enforcement of the policy in which the defendants refuse to recognize the restoration of plaintiff Linton's firearm rights. (Linton Decl., ¶¶ 22-23; Richards Decl., ¶ 5). Deputy Wilson admitted his involvement in the enforcement and policy by and through review of the case, and denial of plaintiff Linton's request in explaining that "this was routinely how the Department handled out-of-state felony convictions that have been set aside or vacated." (Richards Decl., ¶ 5; Exhibit B). Defendant Wilson's direct involvement in the enforcement of plaintiff Linton's case demonstrates he is not entitled to Eleventh Amendment immunity, because injunctive relief to prevent further enforcement of the Department's policy is wholly appropriate.

### E.   THE ORGANIZATIONAL PLAINTIFFS HAVE STANDING.

"It is common ground that the respondent organizations can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494, 129 S.Ct. 1142, 1149 (2009).  It is also well recognized that civil rights advocacy organizations have been permitted to assert the constitutional rights of their members. *Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017) (citing *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct.1163 (1958)). To establish associational standing, an organization must show: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct.

2434, 2441 (1977). Where at least one identified member of an organization is able to demonstrate that he or she has suffered harm, or would suffer harm, it is common to permit that organization's claims to go forward. *See*, *Assoc. Gen. Contractors of Am. v. Cal. Dept. of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (citing *Summers*, 555 U.S. at 498); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 483 (9th Cir. 2011).

Here, individual plaintiffs Linton, Stewart, and Jones, who have directly suffered injury and are suing for prospective relief, are members of the organizational plaintiffs. Irrespective, "the presence in a suit of even one party with standing suffices to make a claim justiciable[.]" *Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 981 (9th Cir. 2013) (citing *Brown v. City of L.A.*, 521 F.3d 1238, 1240 n. 1 (9th Cir. 2008)). Accordingly, this court does not even need to address the organizational standing issue. *See*, *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). Even on summary judgment, where several of the plaintiffs meet their burden of proof regarding standing to bring suit, summary judgment in all plaintiffs' favor for injunctive relief, as a matter of standing, is proper. *Dept. of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330, 119 S.Ct. 765 (1999) (upholding summary judgment for plaintiffs).

By reason of the injuries to and relief sought on behalf of its members, the organizational plaintiffs have associational standing to pursue the injunctive and declaratory judgment sought.

### III.   CONCLUSION

For the foregoing reasons, summary judgment should be entered in plaintiffs' favor as to all claims. In the alternative, partial summary judgment should be entered in their favor on each count.

Dated: October 11, 2022                                  **SEILER EPSTEIN LLP**

/s/ George M. Lee
George M. Lee

Attorneys for Plaintiffs