George M. Lee (SBN 172982)
    gml@seilerepstein.com
**SEILER EPSTEIN LLP**
4 Embarcadero Center, 14th Floor
San Francisco, CA 94111
Phone: (415) 979-0500
Fax:   (415) 979-0511

Attorneys for Plaintiffs
PAUL MCKINLEY STEWART, KENDALL JONES,
FPC ACTION FOUNDATION, FIREARMS POLICY
COALITION, SECOND AMENDMENT FOUNDATION,
CALIFORNIA GUN RIGHTS FOUNDATION and MADISON
SOCIETY FOUNDATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAD LINTON, et al., | Case No. 3:18-cv-07653-JD |
| Plaintiffs, | **DECLARATION OF KENNETH M. MOSCARET IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES** |
| vs. | **[42 U.S.C. § 1988; N.D. L.R. 54-5]** |
| ROB BONTA, in his official capacity as Attorney General of California, et al., | Date:    Sept. 19, 2024 |
| Defendants. | Time:    10:00 a.m. |
| | Courtroom 11, 19th Floor |
| | Judge:    Hon. James Donato |

## DECLARATION OF KENNETH M. MOSCARET

I, Kenneth M. Moscaret, declare as follows:

## I.    INTRODUCTION

1.    I, Kenneth M. Moscaret, am the principal of Moscaret Consulting, Inc., with offices in Sammamish, Washington (near Seattle), and Pasadena, California.  I have been retained by Plaintiffs to offer expert opinions as to the reasonableness of the attorneys' fees sought in Plaintiffs' Motion for Attorney's Fees ("Plaintiffs' fee motion").  Plaintiffs seek to recover the

1

SEILER EPSTEIN LLP

attorney timekeeper fees billed by their counsel, Seiler Epstein LLP ("Seiler Epstein"), in the current action.

2.       As explained in more detail below, it is my opinion that Plaintiffs' counsel's hourly billing rates and the overall requested fees are not only reasonable under applicable Ninth Circuit standards for determining reasonable attorneys' fees in a fee award proceeding, but are in fact *below market* for comparable attorneys performing comparable work in the current San Francisco legal market.

3.       Seiler Epstein has also demonstrated billing judgment in Plaintiffs' fee motion.

4.       I am an attorney at law licensed to practice before all courts of the State of California and before several federal district courts in California, including this Court.  I have personal knowledge of each fact stated herein and would be competent to testify thereto if called upon to do so.

## II.      BRIEF SUMMARY OF EXPERT QUALIFICATIONS

5.       Since 1991, I have specialized full-time in analyzing and opining on the reasonableness of attorneys' fees and the customs and practices of law firms in California and nationwide in handling, managing, staffing, and billing large, complex litigation.  The following paragraphs provide a brief summary of my credentials in this field, with additional experience listed in Exhibit A.

6.       I was the sole lodestar (cross-check) fee reasonableness expert testifying in the *Enron* securities class action litigation in federal court in Houston, Texas in 2008 involving approximately $700 million in disputed legal fees.

7.       I was invited by JAMS on two occasions (in 2005 and again in 2008) to provide continuing legal education seminars for all of JAMS' retired federal and state court judges and justices in California and nationwide on making reasonable fee determinations in large, complex

SEILER EPSTEIN LLP

fee-shifting arbitrations.

8.      I acted as an outside counsel relationship manager, litigation manager, client representative with outside counsel, and billing "gatekeeper" continuously for twelve straight years (1996 – 2008) for the in-house legal department of one of the largest public entities in California, the Los Angeles Unified School District ("L.A. Unified"), which was either a plaintiff or defendant in many large, complex lawsuits during my consulting tenure there.  L.A. Unified's in-house legal department had approximately 35 attorneys by 2008 when my long-term consulting engagement ended.

9.      For those twelve years, I helped oversee and manage L.A. Unified's day-to-day relationships with up to 50 large, midsize, and small law firms, including a number of major national firms, including BakerHostetler, O'Melveny & Myers, Arnold & Porter, and Manatt Phelps, among others.  In that role, I regularly interacted with top litigation partners and trial attorneys at those law firms.

10.      In my twelve years acting as outside counsel billing gatekeeper for L.A. Unified's legal department, I conducted a first-pass review and tentatively approved (or rejected until re-submission) hundreds of outside counsel paper or electronic invoices submitted for payment *each month* on L.A. Unified legal matters (both litigated and non-litigated matters), including both routine, garden-variety litigation and large, complex, high-stakes lawsuits in federal and state courts involving L.A. Unified.  Cumulatively, I estimate that I reviewed *well over 30,000* outside counsel invoices for L.A. Unified's legal department from 1996 - 2008.

11.      During my lengthy engagement with L.A. Unified, I worked with several different individuals who served in the role of General Counsel.  One General Counsel, Richard K. Mason, Esq., provided a public testimonial about my consulting services to L.A. Unified's legal department.  In that testimonial, he stated:  "I found [Mr. Moscaret's] service to be extremely

SEILER EPSTEIN LLP

valuable in helping manage my outside counsel relationships and litigation budget, and in gaining a better understanding of how legal fees were being incurred by my outside counsel in complex litigation.  Moscaret Consulting acted as a trusted go-between for me and my outside law firms."
*See* https://www.feedispute.com/getExpertBio.asp.

12.     Since 2008, in addition to expert testimony regarding legal fees, I have also offered and provided litigation management services to small and midsize companies and public entities that are litigating expensive lawsuits. In those consulting engagements, I work with clients and their outside counsel to help achieve increased litigation management efficiency and more predictable legal budgeting.

13.     I have been retained dozens of times to testify, and have testified more than 50 times, as an expert on the reasonableness of fees for both plaintiffs and defendants in fee lawsuits, fee arbitrations, and prevailing party fee award proceedings involving multimillion-dollar fees billed by top-tier law firms in large, complex litigation in California and nationwide (including in the San Francisco Bay Area).

14.     I have business litigation "first-chair" and "second-chair" trial experience.  A more detailed description of that experience is set forth in Exhibit A.

15.     I have experience evaluating and testifying in recent years on the reasonableness of multimillion-dollar attorneys' fees sought by prevailing parties in fee award proceedings in complex lawsuits in California federal courts, including in the Northern District of California, such as:

      1.) *David Lowery, et al. v. Rhapsody International, Inc.,* Civ. No. 4:16-cv-01135-JSW-JSC (N.D. Cal. June 12, 2020) (Dkt 208)[1];

---

[1] The court summarily *denied* defendant Rhapsody International's motion to strike my expert declaration. *See* 4:16-cv-01135-JSW (Dkt 242).

2.) *Oracle America, Inc. v. Hewlett Packard Enterprise Company,* Civ. No. 4:16-cv-01393-JST-EDL (N.D. Cal. March 22, 2019) (Dkt 902); and

3.) *Stitch Editing Ltd. v. TikTok, Inc.,* Civ. No. 2:21-cv-06636-SB-SK (C.D. Cal. April 21, 2023) (Dkt 537).

16.     Earlier in my career, I evaluated and testified for public entity defendants on the reasonableness of attorneys' fees sought by prevailing plaintiffs in federal court and state court statutory fee-shifting cases, both within and outside California, involving issues of civil rights and public interest.  Those defendants included L.A. Unified, Los Angeles City Attorney's Office, and Washington State Attorney General's Office.

### III.     BRIEF SUMMARY OF OPINIONS

17.     The scope of my engagement was focused on the following fee reasonableness issues:

1.) The current action involves an issue of genuine public interest, and Plaintiffs have demonstrated successful results obtained in this case.

2.) Senior partner George Lee of Seiler Epstein possessed the requisite skill, experience, and reputation to litigate this matter successfully for Plaintiffs.

3.) Seiler Epstein's non-hourly fee arrangement with Plaintiffs shifted a high degree of financial risk to Seiler Epstein in the current action.

4.) Seiler Epstein's hourly rates sought in Plaintiffs' fee motion are below market compared to other well-regarded attorneys handling complex litigation in the San Francisco market in 2024.

5.) I am not offering any opinions on any issues other than the reasonableness of Plaintiffs' lodestar request in this fee motion.

//

//

**SEILER EPSTEIN LLP**

## IV.    MATERIALS REVIEWED IN CONNECTION WITH THIS DECLARATION

18.    All of the opinions, methodology, reasoning, and substantive analysis in this declaration are my own.

19.    In order to formulate my opinions in this declaration, I reviewed many court-filed documents and other case materials in the current action, including the documents and materials listed below.

20.    I reviewed the civil docket for the current action on the PACER website and the court-filed documents in the current action that are available on PACER, including pleadings, motions, briefs, exhibits, court opinions and orders, and other case documents.  As a result, I became sufficiently familiar with the factual background, legal issues, procedural history, and other complexities in the case.

21.    I reviewed all of the billing entries (including no-charge time entries) by Seiler Epstein in this case, all of which were billed by Mr. Lee, who handled the case by himself.

22.    I spoke on multiple occasions with Mr. Lee, who obviously has direct firsthand knowledge of and personal involvement in the current action.  Through these conversations, I learned more about how Mr. Lee handled, managed, staffed, and billed the current action on behalf of Plaintiffs.

23.    Finally, I reviewed certain federal court and state court decisions (both published and unpublished), as well as ethical rules and opinions, that I found to be relevant to my engagement.[2]

24.    My qualifications are summarized in Exhibits A - C attached hereto, which also list

---

[2] While I may generally cite authorities that I have consulted or reviewed in connection with forming my opinions, I am not attempting to offer any "legal" opinions, but rather, cite to them only so that the Court can understand how those authorities fit into my overall reasoning and form a supporting foundation for my opinions.

SEILER EPSTEIN LLP

all publications authored by me in the previous 10 years and a list of all other cases in which I have testified as an expert at trial or deposition during the previous four years.  My compensation is a fixed fee for this opening declaration, and is not contingent on the outcome of Plaintiffs' fee motion.

## V.      EXPERT OPINIONS AND SUPPORTING BASES

### A.      Factors Which I Considered in Evaluating the Reasonableness of Plaintiffs' Fee Request

25.      I am aware that courts consider a variety of factors in assessing the reasonableness of fee awards, including most commonly the 12 factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975) ("the *Kerr* factors").  The Ninth Circuit has stated that courts should consider *some or all* of the 12 *Kerr* factors in making fee awards:

> "'This Circuit requires that courts reach attorneys' fee decisions by considering some or all of twelve relevant criteria set forth in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir. 1975).' *Quesada v. Thomason,* 850 F.2d 537, 539 (9th Cir. 1988).
>
> "The *Kerr* factors are (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."

*Carter v. Caleb Brett LLC*, 757 F.3d 866, 868-869 (9th Cir. 2014).

26.      As a fee expert, I typically consider some or all of those same factors.  In this declaration, I have focused my analysis on the following four factors (which also happen to be, but are not exclusively, *Kerr* factors).  I found them to be significant and relevant in evaluating the reasonableness of the hourly rates and overall fees requested in Plaintiffs' fee motion.  Other factors may overlap with and relate to these four factors, which are:

(i)      the experience, reputation, and ability of the attorneys;

7

(ii)   the amount involved and the results obtained;

(iii)   whether the fee is fixed or contingent; and

(iv)   the customary fee.

**B.   Analysis of the Above-Listed Factors Demonstrating the Reasonableness of Plaintiffs' Fee Request**

      **a)   The Experience, Reputation, and Ability of the Attorneys**

27.   Having worked closely with both in-house counsel and many top-tier law firms in complex lawsuits, I consider this to be an important factor in the fee reasonableness determination. A client's choice of counsel in such lawsuits should be compatible with (i) the time and resource demands of the case, (ii) the legal expertise and procedural experience necessary to prevail, and (iii) the client's litigation objectives in the case.

28.   I was mindful of those same criteria whenever I assisted L.A. Unified's in-house legal department with outside counsel selection and negotiated retainer agreements for L.A. Unified with its chosen law firms.

29.   Having reviewed Seiler Epstein's website's profile of Mr. Lee, and having spoken with Mr. Lee about the current action, I believe he possessed the skill, experience, and reputation to capably represent Plaintiffs in the current action.

30.   Despite having only three senior partners in the firm, Seiler Epstein has decades of litigation and civil trial experience among those three partners, including Mr. Lee.[3]

31.   Furthermore, Mr. Lee appeared to me to be qualified to represent Plaintiffs in a case

---

[3] "Seiler Epstein LLP is comprised of three partners combining nearly one hundred years of legal experience. The firm's partners have represented clients in over one hundred jury trials, numerous bench trials, arbitrations, mediations, and administrative hearings, all with an impeccable success rate. Several of our attorneys have served as Assistant District Attorneys or Deputy City Attorneys for the City of San Francisco and have a depth of trial experience and familiarity with the San Francisco Judiciary matched by no other firm our size. . . ." https://seilerepstein.com/our-firm/

8

SEILER EPSTEIN LLP

of this constitutional significance, given his credentials and background in his Seiler Epstein website profile and as explained in greater detail in the Declaration of George M. Lee in Support of Plaintiffs' Motion for Attorney's Fees ("Lee Declaration") accompanying Plaintiffs' fee motion, such as:

George Lee (admitted California 1994)

> (i)   *30-year litigator and trial attorney as of 2024;*
>
> (ii)   *Los Angeles Daily Journal "Top 100 California Lawyers (2021);"*
>
> (iii)   *Super Lawyers (2023);*
>
> (iv)   *considerable experience in all forms of commercial litigation, civil rights, and constitutional rights disputes.*

**b)   The Amount Involved and the Results Obtained**

32.   This is also an important (two-pronged) factor.  I consider the first prong of this factor, "the amount involved," to involve a comparison of the actual and/or potential stakes involved for the client (whether economic, non-economic, or precedential) in a litigated matter in relation to the amount of legal fees expended.

33.   Regarding the second prong of this factor, "the results obtained," the United States Supreme Court has held that the degree of success is a key factor in determining a reasonable amount of attorneys' fees.  For example, in *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983), the Court held that "the extent of a [litigant's] success is a crucial factor in determining the proper amount of an award of attorney's fees."  In *City of Riverside v. Rivera*,  477 U.S. 561 (1986), the U.S. Supreme Court again said, ". . . [T]he District Court had 'considered the degree of success . . . and found a reasonable relationship between the extent of that success and the amount of the fee award.' (citation omitted) . . . ."  Id. at 566.

34.   Results obtained is a factor which, in my experience as a fee expert, is given

**SEILER EPSTEIN LLP**

considerable weight by courts in determining whether fees are reasonable.

35.     Returning to the first prong of the amount involved, besides the important adjudication by this Court of Second Amendment gun ownership and possession rights in the face of attempted state government prohibition, the current action was additionally being prosecuted by Plaintiff Jones, a career law enforcement officer, to allow him to renew his California Certificate of Eligibility and continue making a living as a certified firearms instructor for law enforcement agencies, which arguably carried a public safety benefit for California.

36.     As to the results obtained, Plaintiffs were successful in obtaining summary judgment.  Based on my review of the Court's Order re Summary Judgment and [Proposed] Judgment in favor of Paul McKinley Stewart and Kendall Jones, as well as the actual Judgment dated June 17, 2024, Plaintiffs accomplished their primary litigation objectives in the current action.

**c)     Whether the Fee is Fixed or Contingent[4]**

37.     Negotiated hourly rates are usually always a more low-risk fee arrangement for law firms than fixed fees and other types of alternative fee arrangements ("AFAs"), which carry greater financial risk for a law firm.  AFAs are intended to shift more risk to the law firm, and may be insisted upon by clients (usually corporate and institutional clients) who want more shared risk in their attorney-client relationships.

38.     I have considerable familiarity and experience with AFAs, including fixed fees. During my 12-year tenure working with them, I negotiated AFAs, including fixed fees, for L.A. Unified's in-house legal department with some of L.A. Unified's 50 outside law firms in both

---

[4] This factor considers the financial risks that the prevailing law firm assumed by not billing the entire case on an hourly basis to paying clients.

SEILER EPSTEIN LLP

large, complex litigation matters and ordinary, routine matters (Exhibit A hereto, at Paragraphs 16-22).

39.     As the Lee Declaration describes, Seiler Epstein entered into a limited fixed fee arrangement with some of the co-Plaintiff advocacy organizations in the current action, consisting of two separate installment payments.  According to Mr. Lee, Seiler Epstein could not be certain at the time the fixed fee agreement was entered into that it would be sufficient to fund the entire matter to conclusion.  The co-Plaintiffs eventually paid Seiler Epstein $25,000 and $16,000, for a total of $41,000, in two installments, with the understanding that Seiler Epstein would thereafter attempt to make itself whole for any unpaid legal fees through a fee award to Plaintiffs.

40.     The current action was a case of first impression under the Second Amendment, with an uncertain outcome for Plaintiffs and no assurance that Plaintiffs would be found to be the prevailing party.  The *Kerr* factors recognize that "the novelty and difficulty of the questions involved" is relevant to a fee reasonableness determination.  The financial risk factor for Seiler Epstein from accepting limited fixed fees was magnified in a case such as this.

41.     Plaintiffs' fee motion lodestar seeks to compensate for the considerable dollar shortfall between the $41,000 total fixed fees paid to Seiler Epstein and the reasonable value of Seiler Epstein's legal services in this matter.

**d)     The Customary Fee**

42.     This factor concerns whether a fee claimant is seeking prevailing market hourly rates for its litigation counsel.  "The customary fee" is typically the fee customarily charged in the locality for similar legal services.[5]

---

[5] *See*, *e.g.*, ABA Model Rules of Professional Conduct, Rule 1.5(a)(3) ("the fee customarily charged in the locality for similar legal services").

43.     Prevailing market rates are generally considered to be customary rates and are presumed to be reasonable.  A prevailing market rate is one that is in line with what other attorneys of comparable skill, experience, and reputation in the relevant legal community would charge to perform similar work.  *See Blum v. Stenson*, 465 U.S. 886 (1984).

44.     As explained in more detail below, I relied in part on published hourly rate survey data showing that Seiler Epstein's rates in the current action were more than reasonable in relation to other attorneys and law firms of comparable skill, experience, and reputation in the San Francisco market where the current action is venued.  They were, in fact, below market, according to that survey evidence.

45.     In addition to published rate survey data, I relied on my personal knowledge of and experience with prevailing market rates charged by well-regarded attorneys in the San Francisco market acquired over my 33 years in this field.  Throughout my entire career, I have continually researched, been deposed many times on, and opined to judges and arbitrators on prevailing market hourly rates in California, including in the San Francisco market, for all types of litigated matters and all types of law firms.

46.     The published rate survey data that I relied on to support my opinion about the reasonableness of Seiler Epstein's rates is found in the latest available edition (i.e., 2023 edition) of the Wolters Kluwer Real Rate Report.[6]

47.     The Real Rate Report is a recognized, judicially-accepted source of prevailing market rate data for partners and associates in different law practice specialties in dozens of geographic legal markets across the United States, including the San Francisco market.  The Real

---

[6] https://www.wolterskluwer.com/en/solutions/enterprise-legal-management/legalview-analytics/real-rate-report.

SEILER EPSTEIN LLP

Rate Report displays hourly rates for the broad local legal market, not just for a narrow segment of the market like *AmLaw* 100/200 firms (as some other rate surveys do).

48.      Courts in California have found the Real Rate Report to be a reliable, admissible tool for determining reasonable rates.[7]

49.      The Real Rate Report collects anonymized hourly rate data from billions of dollars of legal fees and hourly rates that law firms have *actually invoiced* their clients through e-billing software systems such as TyMetrix/ELM Solutions, as opposed to "self-reported" rate data from the law firms themselves.  The most recent 2023 edition of the Real Rate Report includes legal fees and hourly rates actually invoiced to clients through mid-2023.

50.      The Real Rate Report breaks down hourly rates for partners and associates into the following three rate tiers:

> (i)   First Quartile rate (equivalent to the 25th percentile -- the lowest of the three rate tiers);
>
> (ii)  Median rate (equivalent to the 50th percentile);
>
> (iii) Third Quartile rate (equivalent to the 75th percentile -- the highest of the three rate tiers);
>
> (iv) There is no very-top-of-market Fourth Quartile rate shown.

51.      I have utilized the Real Rate Report in the past as a fee expert, as have other fee experts whom I know.  The Real Rate Report is generally accepted by experts in my field, and fee experts other than myself have published articles in the legal media about using the Real Rate Report in making reasonable rate determinations.

---

[7] *See, e.g.*, *Eksouzian v. Albanese*, 2015 WL 12765585, at *3 (C.D. Cal. Oct. 23, 2015) (collecting cases); *Hicks v. Toys 'R' US-Del., Inc.*, 2014 WL 4670896, at *1 (C.D. Cal. Sept. 2, 2014) (relying on Real Rate Report); *Kries v. City of San Diego*, 2021 WL 120830, at *2–4 (S.D. Cal. Jan. 13, 2021) (Real Rate Report was part of sufficient evidentiary foundation for fee expert to opine on reasonable hourly rates).

52.     As previously discussed, Mr. Lee is a senior partner at Seiler Epstein and is a well-regarded, well-credentialed civil litigator and trial attorney in the San Francisco market.  His Seiler Epstein website profile describes him as a commercial litigator who also handles constitutional rights and public interest cases.[8]

53.     Having worked closely in my career with many high-caliber litigation and trial partners in *AmLaw* 100/200 firms throughout California, including the San Francisco market, it is my opinion that Mr. Lee would qualify as a senior litigation partner at any major law firm in the San Francisco market.

54.     For the reasons more particularly discussed in the Lee Declaration, Mr. Lee performed all of the attorney tasks in the current action himself, both partner-level tasks and associate-level tasks.  Seiler Epstein does not have any associates employed by the firm.  However, if Seiler Epstein had had associates, then in my opinion as a former litigation manager, it would have been reasonable for Mr. Lee to have been assisted by an experienced senior associate (rather than a less-experienced junior or midlevel associate) in a case of first impression regarding U.S. constitutional rights like the current action.

55.     In my experience, courts generally respect and defer to the independent judgment and case staffing decisions of senior litigation partners like Mr. Lee in complex litigation, unless

---

[8] "George M. Lee's practice is in primarily in civil litigation matters, with an emphasis on commercial and business litigation, real estate litigation, business and partnership disputes. He has also actively prosecuted civil rights and constitutional claims to secure and defend his clients' rights that are guaranteed by the United States Constitution." https://seilerepstein.com/george-m-lee/.

SEILER EPSTEIN LLP

**SEILER EPSTEIN LLP**

there is evidence that those staffing decisions were patently unreasonable and indefensible, which is not the situation here.  *See, e.g., Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008).[9]

56.      Embedded below in this paragraph are two charts excerpted from the 2023 Real Rate Report, which respectively show prevailing market rates in 2023 for (i) San Francisco litigation partners and associates (first chart); and (ii) for San Francisco "commercial" practice partners and associates (second chart).  I have attached the relevant pages from the 2023 Real Rate Report as Exhibit D hereto explaining the Real Rate Report's methodology and showing the source of the rate data excerpted in the two charts below.[10] I reiterate that these are 2023 rates, not current rates in 2024 when Plaintiffs' fee motion is being filed.

---

[9] "The district court's inquiry must be limited to determining whether the fees requested by this particular legal team are justified for the particular work performed and the results achieved in this particular case. The court may permissibly look to the hourly rates charged by comparable attorneys for similar work, but may not attempt to impose its own judgment regarding the best way to operate a law firm, *nor to determine if different staffing decisions might have led to different fee requests. The difficulty and skill level of the work performed, and the result achieved—not whether it would have been cheaper to delegate the work to other attorneys—must drive the district court's decision*." 534 F.3d at 1115  (emphasis added.)

[10] I am informed that Plaintiffs' counsel has provided the following link should the Court wish to review the entire 225-page version of the 2023 edition Real Rate Report which I relied on: https://www.dropbox.com/scl/fi/tpru47quvzp19kbmtad5o/2023_RRR.pdf?rlkey=7d5tr6e2ildt1o6g yv6asrijj&dl=0.

## Section I: High-Level Data Cuts

**Cities**
By Matter Type

**2023 - Real Rates for Associate and Partner**                      Trend Analysis - Mean

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|------|-------------|------|---|----------------|--------|----------------|------|------|------|
| San Francisco CA | Litigation | Partner | 115 | $436 | $750 | $1,124 | $801 | $744 | $712 |
| | | Associate | 76 | $341 | $450 | $718 | $537 | $523 | $517 |
| | Non-Litigation | Partner | 173 | $563 | $796 | $1,035 | $812 | $769 | $755 |

## Section II: Practice Area Analysis

**Commercial**
By City

**2023 - Real Rates for Associate and Partner**                      Trend Analysis - Mean

| City | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|------|------|---|----------------|--------|----------------|------|------|------|
| San Francisco CA | Partner | 21 | $535 | $736 | $1,003 | $797 | $735 | $696 |
| | Associate | 24 | $375 | $461 | $655 | $550 | $494 | $476 |

57.     I note here that, because the Real Rate Report is based on hourly rates and fees actually billed to clients by law firms via e-billing systems, the Real Rate Report does not include practice categories such as "civil rights" or "public interest."  I am not familiar with any widely-recognized published attorney rate survey which does.

58.     I assigned to senior partner Mr. Lee the Third Quartile partner rates in the above two charts, which is the highest partner rate reported in the Real Rate Report.  The Third Quartile

partner rates in the two charts happen to be "in the same ballpark" with one another, namely, $1,124 (in the first chart) and $1,003 (in the second chart).[11]

59.     Next, had Mr. Lee been assisted by a senior associate on this case, I would have assigned the Third Quartile associate rate in the two charts to that hypothetical senior associate. The Third Quartile associate rates are also in the same ballpark with one another, namely, $718 (first chart) and $655 (second chart).

60.     Seiler Epstein's billing records which I reviewed contain some tasks which I consider to be more partner-appropriate, and other tasks which I consider to be more associate-appropriate in terms of skill, ability, and experience.  Despite that, Plaintiffs have not segregated partner-level and associate-level tasks in their fee motion.  Instead, they have compensated for the mix of partner-level and associate-level tasks performed by Mr. Lee by requesting a "blended" rate of $750 for all of Mr. Lee's work on the case, which I consider reasonable and in line with certain customs and practices that I have seen in the legal marketplace.

61.     I have considerable familiarity and experience with blended rates for law firm partners and associates. During my 12-year tenure working with them, I negotiated blended rates for L.A. Unified's in-house legal department with some of L.A. Unified's 50 outside law firms in both large, complex litigation matters and ordinary, routine matters (Exhibit A hereto, at Paragraphs 16-22).

---

[11]I am aware that these two charts show some Third Quartile associate rates which exceed the First Quartile partner rates. That may arise from the particular law firm data sets used to generate the associates' quartile rates, for example, associate rates from more large law firms. Despite that, the Real Rate Report has been accepted by courts and is generally relied upon by experts in the field like myself.

DECLARATION OF KENNETH M. MOSCARET IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
CASE NO. 3:18-cv-07653-JD

62.     I have also evaluated and testified as an expert on the reasonableness of different blended rate arrangements in large, complex lawsuits involving multimillion-dollar legal fees, where law firms had contractually agreed to charge blended rates to their corporate clients.

63.     The simplest method I have seen, and used myself, for setting a blended partner/associate rate is to calculate the average of the combined partner and associate rates.  Here, for example, applying the Third Quartile rates for San Francisco litigation partners and associates shown in the *first* chart at Paragraph 56 above, the blended rate calculation would be as follows: $1,124 + $718 = 1,842 ÷ 2 = $921 per hour.

64.     If I instead applied the Third Quartile rates for San Francisco "commercial" practice partners and associates in the *second* chart at Paragraph 56, the blended rate calculation would be: $1,003 + $655 = 1,658 ÷ 2 = $829 per hour.

65.     Plaintiffs are requesting a blended rate of only $750 in their fee motion for all of Mr. Lee's time in the current action.  That $750 blended rate is significantly less than both $921 and $829 per hour, and is clearly reasonable in my opinion.

## VI.     OVERALL CONCLUSION

66.     Based on the facts, evidence, and reasoning set forth above, Plaintiffs' counsel's hourly rates and fees requested in the current action are reasonable.

## VII.     RESERVATION OF RIGHTS

67.     I reserve the right to update, amend, and/or supplement this declaration based upon any new and/or additional facts, evidence, or other documents which may come to my attention, or based upon any other information, including other expert reports/declarations, which may be produced.

//

//

SEILER EPSTEIN LLP

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 20th day of June 2024, at Sammamish, Washington.

KENNETH M. MOSCARET

# EXHIBIT A

# EXPERT QUALIFICATIONS OF
# KENNETH MOSCARET, ESQ.

1.      I have set forth below in this Exhibit "A" a complete set of my attorney fee expert credentials.

2.      I have been specializing in this field for the past 33 years since 1991, and have been involved in well over 200 large fee disputes involving well over $2 billion in legal fees to date.  During my career, I have been retained as a consultant and/or testifying expert by *both* sides in fee disputes, including by clients, policyholders, insurance carriers, public entities, and law firms nationwide.

3.      Most of my expert engagements today involve seven-figure, eight-figure, and nine-figure legal fees billed by top-tier law firms in large, complex litigation in California and nationwide.

4.      Since 1991, I have offered expert testimony over 60 times at trial, arbitration, deposition, and in written expert declarations in federal and state courts regarding the (i) reasonableness of legal fees, (ii) propriety of attorney billing practices, (iii) the lodestar issues of reasonable hourly rates and reasonable hours billed, and (iv) efficient litigation management and law firm case staffing practices.[1]

---

[1]      Although the vast majority of my expert witness cases have settled prior to trial, I have testified orally nearly 15 times as a qualified fee expert in court and arbitration hearings.  I have submitted at least 20 written expert declarations in various courts which were admitted into evidence.  I have also given oral expert depositions over 30 times.

5.     I generally describe myself as a customs-and-practices expert who specializes in opining on prevailing customs and practices in the marketplace among sophisticated clients and top-tier law firms regarding how large, complex litigation is typically handled, managed, staffed, and billed. These litigation customs and practices are not merely "local" in nature.  Rather, they are universal attorney billing, litigation management, and case staffing issues within the legal profession that arise in all 50 states and every jurisdiction.  Hence, my expert opinions, such as I have offered here, are not dependent upon subjective, locally-acquired knowledge drawn from having practiced law in a particular legal market.  They apply across the country.

6.     I was found qualified to testify and offered attorney fee reasonableness expert testimony in February, 2008 in the *Enron* securities class action litigation before the U.S. District Court for the Southern District of Texas in Houston.

7.     I was the sole lodestar cross-check fee expert testifying in the *Enron* case about reasonable hourly rates, reasonable hours billed, case staffing, litigation management efficiency, and other related fee and billing issues.  *Enron* is the largest

---

I have testified in court, arbitration, deposition, or by written report/declaration in fee cases in federal courts, state courts, and arbitration venues in California, New York, New Jersey, the Washington D.C./Baltimore area, Texas, and other states.

securities class action lawsuit in U.S. history, and one of the largest business lawsuits generally ever litigated in this country.

8.     The U.S. District Court in *Enron*, in its 209-page published fee ruling, awarded $688 million, plus interest, in attorney's fees to lead counsel Coughlin Stoia Geller Rudman & Robbins (now known as Robbins, Geller Rudman & Dowd) in that case in September, 2008, a record-setting fee award for a securities class action in the U.S.[2]  The District Court described me as one of the "nationally prominent experts on fee awards" who was testifying in the case, as well as a "recognized fee expert," and found me to be "highly qualified to testify about attorneys' fees and market rates."  *In re Enron Corporation Securities, Derivative & ERISA Litigation*, 586 F.Supp. 2d 732 (S.D.Tex. 2008).

9.     Since *Enron* in 2008, I have been retained to testify or have actually testified in some capacity in well over 30 fee cases in federal and state courts and arbitration proceedings across the U.S. wherein the disputed legal fees in large, complex litigation ranged from seven-figures into nine-figures.

---

[2]     I am informed that the final fee award, with accrued interest, exceeded $700 million.

10.   I have opined in the past on all of the substantive fee reasonableness factors which I analyzed in this case.  Judges and arbitrators have admitted into evidence my analysis of fee reasonableness under those factors.

11.   Regarding my background, I graduated with a J.D. from Georgetown University Law Center in Washington, D.C. in 1980, and was admitted to practice in California the same year.  From 1980-1990, I was primarily a business litigator practicing in Los Angeles in California state and federal courts.  I have "first-chair" and "second-chair" trial experience.[3]   As a litigator, I represented many large institutional clients in complex litigation, such as the Hearst Corporation and major savings and loan associations.

12.   In addition to serving as an expert witness, I have given many educational and training seminars on attorney's fees to a variety of business and legal organizations.  For example, in October, 2005 and then again in May, 2008, I was invited by the JAMS organization to conduct live CLE seminars on making reasonable attorney fee awards in large, complex fee-shifting arbitration cases for all of JAMS's retired federal and state court judges/justices in California and nationwide.

---

[3]   Before I became a full-time attorney fee expert, I primarily litigated cases for corporate clients on both the plaintiff and defense side.  Nearly all of those lawsuits settled before trial actually started.  I did take about five to six cases to trial through judgment, mainly in California state courts.  I was the sole trial counsel in half of those cases, second-chair in the rest.  My prior litigation experience and attorney fee expert credentials, including articles which I have published, are listed and readily available on my firm's website at www.FeeDispute.com.

13.     One of my CLE seminars was converted to DVD video and an audio podcast for JAMS judges to continue to access and use in the future.  A copy of the acknowledgment letter which JAMS sent me afterwards is attached hereto as Exhibit "B."

14.     I was invited to be a guest speaker at the annual meeting of the College of Commercial Arbitrators in Los Angeles in November, 2014 on the subject of reasonable attorney fee awards in fee-shifting arbitration cases.  The College of Commercial Arbitrators is an invitation-only organization comprised of elite nationally- and internationally-recognized commercial arbitrators.

15.     I was also invited to speak to the American Bar Association Section of Dispute Resolution at their 2015 annual spring conference in Seattle on the topic of attorney fee reasonableness in large, complex cases.

16.     For 12 years from 1996 - 2008, I acted as an ongoing consultant each month to the Office of General Counsel of the Los Angeles Unified School District ("L.A. Unified"), the nation's second largest public school district, which would have been in the Fortune 500 back then were it a private corporation, based on the size of its annual budget.  L.A. Unified had many high-exposure legal matters, as large corporations often have, and paid many millions of dollars each year in outside counsel fees.

17.    One of my several ongoing responsibilities during those 12 years working with L.A. Unified's in-house legal department was to act as their outside counsel billing "gatekeeper."  In that capacity, I reviewed and tentatively approved (or rejected until re-submission) hundreds of outside counsel paper or electronic invoices submitted for payment each month on L.A. Unified legal matters (both litigated and non-litigated matters), including both routine, garden-variety litigation and large, complex, high-stakes lawsuits in federal and state courts involving L.A. Unified. I performed that role each month from 1996 - 2008 before those law firm invoices were forwarded to L.A. Unified's in-house attorneys for final payment approval.

18.    Those invoices were submitted by up to 50 different large, midsize, and small law firms which worked for L.A. Unified, many of which were major national law firms.  Most of those law firms had their headquarters or major offices in Southern California.  Some of them had their headquarters or major offices in the San Francisco Bay Area.  Many of L.A. Unified's litigated cases were large, complex matters that were high-profile, hard-fought, and the subject of frequent reporting in the local news media in Los Angeles, including the following examples:

- Belmont Learning Center litigation (at the time called "the most-expensive high school in the U.S.," with many hundreds of millions of dollars in construction costs);

- Mayoral school district takeover litigation (i.e., AB 1381 litigation);

- Ambassador Hotel dispute (against developer Donald Trump, for control of this world-famous landmark near downtown Los Angeles);

- multibillion-dollar-exposure class action lawsuit by the ACLU alleging systemic failure to provide legally-mandated special education services to all qualifying L.A. Unified students (known as the "Chanda Smith" case);

- massive class action lawsuit by the ACLU against deteriorating public school facilities (known as the "Williams" case);

- school construction litigation;

- toxic school site cases

19.     I estimate that, from 1996 - 2008, I reviewed well more than 30,000 law firm invoices in total in all manner of L.A. Unified cases from large, midsize, and small law firms that worked for L.A. Unified.[4]   My invoice-review work for L.A. Unified was in addition to the many thousands of other law firm invoices that I have reviewed in the over 200 expert engagements that I have had over the years.

20.     Throughout my consulting engagement with L.A. Unified, I also acted as an authorized "client representative" each month in dealing with L.A. Unified's

---

[4]     L.A. Unified received 300 - 600 outside counsel invoices each month, on average, from 1996 - 2008.  My monthly invoice-review function for L.A. Unified was a substantial part of my expert consulting practice during those years.

outside counsel, meaning that I acted exclusively on the "client" side in dealing with those law firms for 12 years. In that capacity, I performed the following tasks:

(i) oversaw and made recommendations on litigation management practices by L.A. Unified's outside counsel on L.A. Unified cases;

(ii) monitored and made recommendations on outside counsel's billing, timekeeping, and case staffing practices on L.A. Unified cases;

(iii) communicated with outside counsel on any client relationship issues whenever necessary, with the full authority of the General Counsel's Office;

(iv) provided group training seminars as well as individual one-on-one advice on all of the above issues to L.A. Unified's in-house attorneys;

(v) assisted with law firm bidding competitions and selection of outside counsel for L.A. Unified legal matters; and

(vi) negotiated fee arrangements, hourly rates, and retainer agreements with L.A. Unified's outside counsel.

21. Toward the end of my consulting engagement with them, L.A. Unified asked me to negotiate multi-year hourly rate arrangements with approximately 40 different law firms who were bidders under L.A. Unified's law firm RFP at the time. I spent months handling those rate negotiations. About one-third of the law firms with which I negotiated were major national law firms.

22. During my lengthy engagement with L.A. Unified, I worked with

several different individuals who served in the role of General Counsel.  One General Counsel, Richard K. Mason, Esq., provided a public testimonial about my consulting services to L.A. Unified's in-house legal department.  In that testimonial, he stated: "I found [Mr. Moscaret's] service to be extremely valuable in helping manage my outside counsel relationships and litigation budget, and in gaining a better understanding of how legal fees were being incurred by my outside counsel in complex litigation.  Moscaret Consulting acted as a trusted go-between for me and my outside law firms."

*See* https://www.feedispute.com/getExpertBio.asp.

23.    In 2006, the County of Los Angeles also retained me to conduct a litigation management review of the 270-attorney Los Angeles County Counsel's Office (Los Angeles County's in-house legal department).  At the time, Los Angeles County had one of the largest, if not the largest, in-house county legal departments in the U.S.  Among other things, I examined how the County Counsel's Office handled, managed, and disposed of some of its most difficult, complex, and high-stakes lawsuits.   My expert's report was prepared for and submitted to the Los Angeles County Board of Supervisors.[5]

---

[5]    I worked in parallel with the Los Angeles County Auditor-Controller's Office on this project.  Both of us submitted our own separate written reports to the Los Angeles County Board of Supervisors, each covering different aspects of the County Counsel's operations.   I focused on litigation strategy, litigation management efficiency, and outside counsel fees and billing practices.

24.    I have published over 35 articles to date in the legal and business media on attorney's fees, billing, and litigation management (all of which are listed at www.feedispute.com/getPublishing.asp).    I have also conducted over 40 CLE seminars and other presentations on these subjects for client groups, law firms, and bar associations.

25.    I am familiar with various court decisions in California and from across the U.S., both federal and state, reported and unpublished, and with various ethical rules and opinions, which relate to attorney fee reasonableness and litigation management efficiency issues.

26.    I have spoken to many law firm partners in California and outside the state about those same issues during my career in this field.    I also read several statewide and national legal publications each day which often report on those issues, e.g., the online editions of the Los Angeles/San Francisco *Daily Journal, The (S.F.) Recorder, The National Law Journal, The American Lawyer*, and *Law.com*.

27.    I do not limit myself to helping just big clients and big law firms with attorney fee and litigation management issues.    I created a first-of-its-kind consumer legal cost management blog (*www.myLawCoach.com*) designed to help ordinary consumer clients manage all of the "dollars-and-cents" business aspects of their attorney-client relationships.    My blog delivers practical tips and advice at no charge

over the Internet to the types of individuals who might not otherwise have access to that kind of information. These tips and advice are meant to apply only to simple, non-complex consumer lawsuits.

28.    I try to offer expert opinions which are consistent, wherever possible, with judicial decisions and ethical rules and opinions that have addressed attorney fee reasonableness and litigation management issues.  I may cite to any federal and state case law (both published and unpublished) and ethical authorities (both binding or advisory) which I have consulted, considered, reviewed, or relied upon in forming my own opinions.  I do that only so that a court can understand how those case authorities and ethical opinions fit into my overall reasoning and form a supporting foundation for my opinions.   I am not attempting to offer "legal" opinions.

# EXHIBIT B



THE RESOLUTION EXPERTS

October 24, 2005

Kenneth Moscaret, Esq.
Moscaret Consulting
2240 275th Ct., S.E.
Sammamish, WA 98075

Dear Ken:

On behalf of the JAMS Institute, please accept my sincerest thanks for your October 20 CADRE presentation on Resolving Complex Attorney Fee Disputes.

The multi-site format of the program allowed us to reach JAMS Panelists throughout California, many of whom, as you know, handle cases involving fee disputes on a regular basis. We have already received a good deal of positive feedback on the presentation from participants around the state, and expect that a number of them will be contacting you with additional questions and inquiries.

The JAMS Institute was originally established to demonstrate JAMS' commitment to continuing education for its neutrals. By bringing in new ideas and fresh perspectives on the work we do, you have made an invaluable contribution to our role as the "Resolution Experts".

Thank you again.

Sincerely,

Jay Folberg
*Executive Director, JAMS Institute*

# EXHIBIT C

## *Published Articles (Previous 10 Years)*

1. Association of Business Trial Lawyers (ABTL) Report, Northern California chapter, summer 2014; "Fee Awards: Fee-Shifting Cases Versus Attorney's Fees As Damages."
2. Los Angeles Daily Journal, June 12, 2015; "You Gotta Show Why Fees Are Reasonable."
3. Los Angeles Daily Journal, June 19, 2015; "Did Your Client Consent to Your Fees?"
4. Los Angeles Daily Journal, August 26, 2016; "Fighting to Show That Attorney Fees Are Reasonable."
5. Los Angeles Daily Journal, January 13, 2017; "Resolve Large Fee Disputes Effectively" (co-author).
6. Los Angeles Daily Journal, April 14, 2017; " Some Fee Fights Simply Mean More Litigation."
7. Los Angeles Daily Journal, January 7, 2022; "Early Evaluation Can Help Quickly Resolve Your Fee Disputes."
8. Los Angeles Daily Journal, March 19, 2024; "In a Fees-As-Damages Case, a Rule 26 Stipulation Can Protect Draft Reports and Communications."

## *Past Live Expert Testimony (Previous 4 Years)*

1.) National Union Fire Insur. Co. v. Fresenious Medical Care:  DEPOSITION
(a)  New York County Supreme Court, Commercial Division (2021)
(b)  retained by Gibson Dunn & Crutcher o/b/o Plaintiff

2.) Rafael Torres v. Technion Contractors TCI, Inc.:  DEPOSITION
(a)  Los Angeles County Superior Court (2022)
(b)  retained by Glynn, Finley, Mortl, Hanlon & Friedenberg o/b/o Defendant and Cross-Complainant

3.)  General Atomics v. U.S. Dept. of Defense (Defense Contract Management Agency):  DEPOSITION
(a)  Armed Services Board of Contract Appeals (ASBCA) (2023)
(b)  retained by Gibson Dunn & Crutcher o/b/o Claimant

4.)  Clean & Sober Media v. HUB Insurance:  DEPOSITION
(a)  Los Angeles County Superior Court (2023)
(b)  retained by Parker Schaffie o/b/o Plaintiff

5.)  Clean & Sober Media v. HUB Insurance:  TRIAL
(a)  Los Angeles County Superior Court (2023)
(b)  retained by Parker Schaffie o/b/o Plaintiff